[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 4, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-13987
Non-Argument Calendar

_____

BIA Nos. A96-292-319 & A79-451-588

JAIME RUIZ,
SANDRA MILENA SANCHEZ CABRERA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petitions for Review of an Order of the
Board of Immigration Appeals

_____

**(January 4, 2006)**

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Jaime Ruiz and Sandra Milena Sanchez Cabrera, through counsel, petition this Court for review of the Board of Immigration Appeals' ("BIA's") order summarily affirming the immigration judge's ("IJ's") order of removal and denial of the petitioners' application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), filed pursuant to INA §§ 208, 241, 8 U.S.C. §§ 1158, 1231.[1]  The petitioners challenge on appeal whether substantial evidence supported the IJ's (1) adverse credibility determination, and (2) alternative determination that the petitioners failed to establish statutory eligibility for either asylum or withholding of removal.  For the reasons set forth more fully below, we affirm.

On September 12, 2002, Ruiz, a native and citizen of Colombia, entered the United States as a non-immigrant visitor for pleasure, with authorization to remain in the United States for a period not to exceed March 11, 2003.  On December 1, 2002, Ruiz filed an application for asylum and withholding of removal, asserting that, if he returned to Colombia, he would be persecuted by the Revolutionary Armed Forces of Colombia ("FARC"), a guerilla organization, on account of his

_____

[1] Congress recently directed that all petitions for review will be governed under the permanent provisions of the Illegal Reform and Immigrant Responsibility Act of 1996 ("the IIRIRA").  See Huang v. U.S. Att'y Gen., No. 04-15455, slip op. at 382 n.3 (11th Cir. Sept. 8, 2005) (citing the REAL ID Act of 2005, Pub.L. 109-13, 119 Stat 231 (May 11, 2005)).

membership in a particular social group and his political opinion.[2] Ruiz specifically contended that the FARC had threatened to kill him if he returned to Colombia, due to his campaign work for the United Popular Movement ("UPM"), during the August 2002 mayoral election in the Municipality of Patia, Colombia.

In April 2003, the former Immigration and Naturalization Service ("INS")[3] served Ruiz and his wife with notices to appear ("NTAs"), charging them respectively with removability for remaining in the United States for a period longer than permitted, pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), and for being present in the United States without being admitted or paroled, pursuant to INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). Ruiz appeared before an IJ and, through counsel, conceded the petitioners' removability.

In December 2003, at a hearing on the petitioners' application for asylum and withholding of removal, Ruiz, who was the only witness, offered the following testimony. As a member of the UPM, which was affiliated with the Liberal Party, Ruiz managed social-work projects and actively campaigned for the party's

---

[2] Ruiz also included in his application for relief his wife, Sandra Milena Sanchez Cabrera , who also was a native and citizen of Colombia and who had entered the United States without inspection on or about September 27, 2002. After entering the United States, Ruiz's wife gave birth to a son on November 17, 2002. References in this opinion to Ruiz also will include his wife.

[3] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. This legislation created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department.

candidate during the mayoral election in Patia in August 2002. As part of this campaign work, Ruiz organized weekly meetings of approximately 100 people, at which he and the candidate discussed the UPM's goals, including the importance of not cooperating with the FARC. On August 27, 2002, two days after the UPM's candidate lost this mayoral election, at approximately noon, two unidentified armed men on a motorcycle stopped Ruiz, called him by name, and told him to leave the region because "the activities [he] was carrying out with their people [were] not well looked upon." These men did not state that they belonged to a particular political group, and Ruiz did not report immediately this threat to the police or any other governmental authority.

On September 1, 2002, while Ruiz was in the City of Popayan, Colombia, three men in a gray Toyota camper stopped him on the street, forced him into their vehicle, held him at gunpoint for approximately half an hour, and again ordered him to leave the region. These men also insulted Ruiz, beat him, and dumped him on the Pan American Highway. They told Ruiz that Commandant de Felipe, a member of the FARC, had ordered Ruiz to leave. Ruiz also did not report this incident to the police because he was frightened.

Ruiz further testified that, on September 4, 2002, two armed men on a motorcycle, one of whom previously had threatened Ruiz, stopped Ruiz as he was leaving his parents' farm, approached Ruiz with a gun in his hand, and told him

4

that, unless he left the region by the following weekend, he and his family would "suffer the consequences." On September 5, 2002, Ruiz moved with his family to Popayan, and they stayed there until they moved to Ruiz's in-laws' home in Cali, Colombia, which was 100 kilometers from their home. Ruiz flew to the United States on September 12, 2002.

On the other hand, Ruiz's wife, who did not have a visa to enter the United States, did not leave Colombia until September 24, 2002. In the intervening period, Ruiz's wife, who was living with her in-laws in Cali, received four threatening phone calls from men who identified themselves as FARC guerillas. During these calls, the men asked about Ruiz's whereabouts and threatened that they would find him, kill him, and kill anyone who was hiding him. Ruiz stated that he believed he could not relocate within Colombia because the FARC was "all over the country," and because members of the FARC wanted him killed.[4] Ruiz, however, did not assert that his ten-year-old son, who was still living in Cali with his in-laws, and his parents, who continued living in Patia, had been harmed.

In addition to this testimony, Ruiz submitted a translated "penal denouncement," which his attorney had filed on his behalf with the Public Defender's Office in Popayan ("the Complaint"), on September 9, 2002. Although

---

[4] When the government asked Ruiz why members of the FARC did not kill him during any of their three encounters, Ruiz responded: "I think that it would not be to their benefit to have killed me due to the relationship I had with the farming people."

5

Ruiz described in the Complaint the same three harassing incidents that he identified during the evidentiary hearing, he stated in the Complaint that he could not identify the source of the alleged threats because, due to "all kind[s] of illegal organizations" operating in the region, it was impossible to determine which one made the threats.[5] He explained that he had no documentary evidence, and that his parents and siblings were scared because they did not know the origin of the threats. Furthermore, Ruiz did not allege in the Complaint that men held him at gunpoint and beat him on September 1, 2002, and, instead, stated that he was afraid that "something more serious was going to happen."

The government submitted for the IJ's review the U.S. State Department's 2002 Country Report on Human Rights Practices for Colombia ("2002 Country Report"). The 2002 Country Report included that Colombia is a constitutional, multiparty democracy, but that the government's human-rights record remained poor. Internal security was maintained by both the armed forces and the national police. As a result of armed conflict between the government, right-wing paramilitary groups, leftist guerillas, including the FARC, and the National Liberation Army ("ELN"), 5,000 to 6,000 civilians were killed during 2002, including combat casualties, political killings, and forced disappearances. The

---

[5] When the IJ stated that he was concerned by the fact that the Complaint did not include that members of the FARC had harassed Ruiz, and the IJ asked Ruiz about this omission, Ruiz did not explain it.

6

guerillas, particularly the FARC, were responsible for a large percentage of civilian deaths and appeared to have committed a higher percentage of Colombia's unlawful killings than the previous year, often targeting noncombatants. In 2002, the FARC also committed numerous politically motivated kidnapings in an attempt to destabilize the government.

Additionally, the record included the U.S. State Department's June 1997 Profile of Asylum Claims and Country Conditions for Colombia ("Profile"), which stated that an estimated 10,000 to 15,000 full-time guerrillas had organized in over 100 groups and represented a "growing challenge to [g]overnment security forces," along with influencing more than half of the country's municipalities. Guerilla targets included those persons who (1) refused to submit to recruitment or extortion, and (2) were suspected of collaborating with authorities. This Profile, however, also discussed that Colombia is a large country of more than a million square kilometers and 35.5 million people, that violence generally is centered in a few provinces, and that persons "fleeing guerillas or police/military harassment or threats in conflictive zones usually are able to find peaceful residence elsewhere in the country."

In an oral decision, the IJ found the petitioners removable, denied their application for asylum and withholding, and ordered them removed to Colombia. The IJ explained that, in denying the petitioners relief from removal, he was

7

relying on both an adverse credibility determination and his conclusion that Ruiz had failed to establish eligibility for either asylum or withholding of removal. In reaching his adverse credibility determination, the IJ discussed that he had "taken into account not only [Ruiz's] demeanor while testifying, but also the rationality, internal consistency and inherent persuasiveness of his testimony." The IJ also stated that, although Ruiz had testified about three specific incidents, he had not included in the Complaint his attempted kidnaping on September 2001, along with failing to report any of these events to the Colombian police. The IJ discussed that he had not found plausible Ruiz's testimony that he could not relocate within Colombia because (1) Ruiz did not include this belief in the Complaint; (2) Ruiz testified that members of the FARC only had told him to leave the area; (3) if members of the FARC had wanted to kill Ruiz, they could have done so during any of the three harassing incidents; and (4) members of Ruiz's family remaining in Colombia had not been harmed. Moreover, the IJ found that, if Ruiz's family had been threatened, Ruiz would not have left his son in the same home where these threats were made.

In alternatively explaining why Ruiz had failed to show his eligibility for asylum, the IJ discussed that Ruiz neither had shown that the FARC had targeted him, or that the FARC had targeted him because of his political opinion. The IJ stated that, although Ruiz submitted in support of his application the Complaint, he

had not alleged in the Complaint that the threats were made by the FARC and, in fact, had stated that it was impossible to determine who had made the threats because of all of the illegal organizations operating in the region. Moreover, as discussed above, the IJ determined that Ruiz could have avoided future persecution by relocating within Colombia. The IJ also determined that Ruiz had failed to satisfy the higher burden required for withholding of removal. The IJ concluded that the petitioners were not eligible for either asylum or withholding of removal.

Ruiz appealed the IJ's decision to the BIA, arguing that the IJ had erred in concluding that he was not statutorily eligible for asylum or withholding of removal. In a supporting brief, Ruiz contended that the record reflected that (1) he had participated in political activities on behalf of the UPM; (2) the FARC, in harassing him and his family, had been motivated, at least in part, by Ruiz's actual and imputed political opinion; and (3) considering Ruiz's past harassment and the current country conditions, a reasonable person in his position would fear future persecution. The BIA summarily adopted and affirmed the IJ's decision.

As discussed above, the petitioners are arguing on appeal that the IJ erred in reaching his adverse credibility determination. The petitioners contend that, to the extent the IJ concluded that Ruiz's testimony was inconsistent with his statements in the Complaint, (1) the IJ never gave him the opportunity to explain these inconsistencies during the evidentiary hearing, and (2) Ruiz would have explained

that he did not reference the FARC in the Complaint because he feared that the FARC had infiltrated the police and the Public Defender's Office. The petitioners also assert that Ruiz's testimony generally was consistent with his asylum application, and that both of these documents referenced the FARC, as well as identifying three specific incidents of past persecution.

When a single member of the BIA summarily affirms the IJ's decision without an opinion, such as here, the IJ's decision becomes the final removal order subject to review. Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1284 n.1 (11th Cir. 2003). To the extent that the IJ's decision was based on a legal determination, our review is de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). On the other hand, the IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (quotation and internal marks omitted).

We "cannot engage in fact-finding on appeal, nor may [it] weigh evidence that was not previously considered below." Id. at 1278. Moreover, "[u]nder the substantial evidence test, we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc),

cert. denied, 125 S.Ct. 2245 (2005).  Thus, a finding of fact will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings."  Id.

A credibility determination, which is a factual finding, is reviewed under the substantial evidence test; thus, we "may not substitute [our] judgment for that of the [IJ] with respect to credibility findings."  D-Muhumed, 388 F.3d at 818. Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments.  See In re B-, 21 I & N Dec. 66, 70 (BIA 1995); see also Dailide v. U.S. Att'y Gen., 387 F.3d 1335, 1343 (11th Cir. 2004) (affirming the BIA's adverse credibility determination, which was based upon its finding that the alien's testimony conflicted with his answers to interrogatories and other documentary evidence).

If credible, an alien's testimony may be sufficient, without corroboration, to sustain his burden of proof in establishing his eligibility for relief from removal. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005).  "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application."  Id.  However, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant."  Id.  If an applicant produces evidence beyond his own testimony, "it is

not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." Id. Furthermore, "the IJ must offer specific, cogent reasons for an adverse credibility finding." Id. "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by 'specific, cogent reasons[,]' or was not based on substantial evidence." Id. (quotation omitted).

In the instant case, the IJ offered "specific, cogent reasons" for his adverse credibility finding by stating that, although Ruiz had testified about three specific incidents of past persecution, he had not included in the Complaint his attempted kidnaping on September 1, 2002, along with failing to report these harassing incidents to the Colombian police. The IJ discussed that he had not found plausible Ruiz's testimony that he could not relocate to another part of Colombia because (1) Ruiz did not include this belief in the Complaint; (2) Ruiz testified that members of the FARC only told him to leave the region; (3) if members of the FARC wanted to kill Ruiz, they could have done so during any of the three harassing incidents; and (4) members of Ruiz's family who had remained in Colombia had not been harmed. Moreover, the IJ found that, if Ruiz's family had been threatened, Ruiz would not have allowed his son to remain in the same house where these threats were made.

Furthermore, the record reflects that, although Ruiz testified that he could not relocate within Colombia because members of the FARC wished him dead, he also testified that, during each contact he had with the FARC, he simply was ordered to leave the area. Moreover, Ruiz's parents continued to live on their farm, and his son continued to live with his in-laws, in the same areas where the FARC allegedly had threatened Ruiz and his family. Indeed, although Ruiz stated that he was kidnaped and held at gunpoint in Popayan on September 1, 2002, he moved his family to Popayan on September 5, 2002.

Examining the petitioners' alleged corroborating evidence, although Ruiz conceded in the Complaint that he could not identify the source of the alleged threats because "all kinds of illegal organizations" operated in the region, and it was impossible to determine which one made the threats, and that his parents and siblings were scared because they did not know the origin of the threats, he testified that he was harassed by members of the FARC based on his activities with the UPM. Contrary to Ruiz's argument on appeal, the IJ gave him the opportunity to explain this inconsistency during the evidentiary hearing. Regardless, as discussed below, Ruiz—not the IJ—bears the burden of proving eligibility for asylum. See D-Muhumed, 388 F.3d at 818. Additionally, although Ruiz testified that the men who kidnaped him on September 1, 2002, held him at gunpoint and beat him, he omitted these allegations in the Complaint, and stated, instead, that he

13

was afraid that "something more serious was going to happen." Thus, the IJ's reasons for his adverse credibility determination are supported by substantial evidence, and nothing in the record compels us to substitute our judgment. See D-Muhumed, 388 F.3d at 818; see also Adefemi, 386 F.3d at 1027.

The petitioners also argue that the IJ erred in alternatively concluding that they were not statutorily eligible for asylum or withholding of removal based on Ruiz's political opinion.[6] The petitioners contend that they established that the alleged harassment was based on Ruiz's political opinion as a member of the UPM by testifying that (1) he was a leader in the UPM who spoke openly against the FARC, (2) the men who harassed him identified themselves as members of the FARC, and (3) these persons instructed him to leave the area and to stop his activities. The petitioners also assert that they established a "well-founded fear" of future persecution through both the above testimony, as well as statements in the 2002 Country Report reflecting the FARC's country-wide activities in Colombia. Finally, the petitioners argue that the IJ should have granted them withholding of removal because, in light of Ruiz's past opposition to the FARC, statements in the 2002 Country Report reflecting FARC's country-wide capacity to harm, and a

---

[6] Because the petitioners have not argued on appeal that the IJ should have granted them either asylum or withholding of removal based on Ruiz's membership in a social group, they have abandoned this issue. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (concluding that the petitioners abandoned an issue by failing to raise it in their initial appellate brief).

14

report by the INS's Resource Information Center ("RIC"),[7] it is more likely than not that the petitioners will be persecuted on account of Ruiz's political opinion if they return to Colombia.

As discussed above, an IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." See Al Najjar, 257 F.3d at 1283-84. An alien who arrives in, or is present in, the United States may apply for asylum. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).[8] A "refugee" is defined as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion,

_____

[7] To the extent Ruiz is relying on this RIC Report, he states that it includes that "[t]he FARC has a presence in virtually all of the nation's 32 departments and urban centers and has a country-wide capability to harm . . . anyone whom . . . the guerillas believe opposes the FARC's . . . leftist politics or their use of armed tactics." However, because this document is not part of the record on appeal, we will not consider it. See Forgue, 401 F.3d at 1286 (holding that we "cannot find, or consider, facts not raised in the administrative forum").

[8] Pursuant to the REAL ID Act, INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), was amended to add "The Secretary of Homeland Security or the Attorney General," as if enacted on March 1, 2003. See Pub.L. 109-13, 119 Stat. 231 (May 11, 2005), Division B, Sec. 101, 8 U.S.C. § 1158(b)(1) and note (1).

nationality, membership in a particular social group, or political opinion . . ..

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). "The asylum applicant carries the burden of proving statutory 'refugee' status." D-Muhumed, 388 F.3d at 818.

To establish asylum eligibility, the petitioner must, with specific and credible evidence, demonstrate (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. If the petitioner demonstrates past persecution, there is a rebuttable presumption that he has a well-founded fear of future persecution. 8 C.F.R § 208.13(b)(1). If he cannot show past persecution, then the petitioner must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable. Al Najjar, 257 F.3d at 1289. The subjective component can be proved "by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation omitted).

An alien seeking withholding of removal under the INA similarly must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political

16

opinion." See INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). The burden of proof for withholding of removal, however, is "more likely than not," and, thus, is "more stringent" than the standard for asylum relief. Sepulveda, 401 F.3d at 1232.

The statutes governing asylum and withholding of removal protect not only against persecution by government forces, but also against persecution by non-governmental groups that the government cannot control, such as the FARC. See Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437 (11th Cir. 2004). However, "[p]ersecution on account of . . . political opinion . . . is persecution on account of the victim's political opinion, not the persecutor's." Id. at 437-38 (quoting INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992) (emphasis in original)). The applicant must present "specific, detailed facts showing a good reason to fear that he will be singled out for persecution on account of such an opinion." Al Najjar, 257 F.3d at 1287. Thus, evidence that either is consistent with acts of private violence or the petitioner's failure to cooperate with guerillas, or that merely shows that a person has been the victim of criminal activity, does not constitute evidence of persecution based on a statutorily protected ground. Sanchez, 392 F.3d at 438.

In Sanchez, we examined a petitioner's challenge to the IJ's decision that the petitioner was not eligible for withholding of removal because the petitioner had not shown that the FARC's interest in her was related to a statutorily protected

17

ground.  See id. at 436.  In support of the petitioner's argument that this decision was erroneous, she cited to her testimony that, after she refused to cooperate with the FARC, and because she was "not in agreement with the way [FARC had] destroyed the country," the FARC had demanded money from her, and, after she had left Colombia, had threatened her and another family member who had refused to cooperate.  See id.  We determined that the petitioner merely had established that the FARC had harassed her due to her refusal to cooperate with it, and had failed to show actual or imputed political opinion, much less any connection between the petitioner's alleged political opinion and the FARC's alleged persecution.  See id. at 438.  We, therefore, concluded that the petitioner was not eligible for withholding of removal.  See id.

Here, Ruiz contended in his application that the FARC had declared him an enemy and threatened to kill him due to his work with the UPM.  Additionally, Ruiz testified that (1) he organized weekly meetings, at which he discussed the UPM's goals, including the importance of not cooperating with the FARC; (2) members of the FARC stopped and threatened to kill him on three occasions, based on his work with the UPM; and (3) persons who identified themselves as members of the FARC made four phone calls to Ruiz's wife, after Ruiz left for the United States, threatening to kill him and anyone who was hiding him.

18

However, as discussed above, the IJ's determination that Ruiz's testimony was not credible was supported by the evidence. Indeed, if Ruiz had been kidnaped and threatened in Popayan, it is illogical that he would have moved his family to this location four days after the threats were made. Moreover, although Ruiz explained in the Complaint the alleged incidents of past persecution, he failed to make any reference to the FARC. See Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (explaining that "[t]he weaker an applicant's testimony . . . the greater the need for corroborative evidence"). To the contrary, in the Complaint, Ruiz contended that he could not identify the source of the threats because of the prevalence of illegal organizations in the area. See Sanchez, 392 F.3d at 438. Thus, Ruiz did not present "specific, detailed facts" that demonstrated that his political participation with the UPM was causally connected with the harassment, or that he had an objective well-founded fear of future persecution based on this activity. See Al Najjar, 257 F.3d at 1287.

The petitioners also failed to demonstrate, in the alternative, a future threat to their life or freedom in Colombia, based on Ruiz's political opinion, or that they could not avoid a threat by relocating to a different region of Colombia. See Mazariegos v. Office of U.S. Att'y Gen., 241 F.3d 1320, 1327 (11th Cir. 2001) (explaining that an alien either must pursue an "internal resettlement alternative" in his own country, or establish that this is not possible, before seeking asylum here).

19

As discussed above, the IJ's finding as not credible Ruiz's testimony that he could not relocate to avoid future persecution was supported by substantial evidence in the record. In addition, Ruiz's claim was contradicted by his testimony that his son and his parents have remained unharmed in the region of Colombia where Ruiz allegedly was threatened. Cf. Tawm v. Ashcroft, 363 F.3d 740, 743 (4th Cir. 2004) (concluding as persuasive authority that an alien did not establish a well-founded fear where, among other things, his family continued to live in Lebanon without incident).

To the extent Ruiz cites in support to statements in the 2002 Country Report as evidence that the FARC's influence in Colombia was widespread, the IJ may "rely heavily" on State Department reports. See Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1243 (11th Cir. 2004). However, the Profile included that persons in Colombia who are "fleeing guerillas or police/military harassment or threats in conflictive zones usually are able to find peaceful residence elsewhere in the country." Regardless, a contrary conclusion is not compelled by this evidence in the 2002 Country Report because, as discussed above, the petitioners failed to demonstrate that they will be singled out for persecution on account of Ruiz's political activities with the UPM. See Sepulveda, 401 F.3d at 1232 n.7 (affirming IJ's opinion denying asylum despite the inclusion in the relevant country reports that guerillas exercised an influence throughout Colombia because the petitioner

20

had failed to establish that she would be singled out for persecution on account of a protected ground).  Thus, the IJ's denial of asylum and withholding of removal was supported by substantial evidence.  See Adefemi, 386 F.3d at 1027; see also Mazariegos, 241 F.3d at 1324-25 n.2 (explaining that, "if an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of [removal]").

Accordingly, we conclude that substantial evidence supported the IJ's adverse credibility determination, along with the IJ's alternative determination that the petitioners failed to establish statutory eligibility for either asylum or withholding of removal.  We, therefore, deny the petition for review.

**PETITION DENIED.**