[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 23, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-13245
Non-Argument Calendar
_____

BIA Nos. A95-895-568 & A95-895-569

JORGE ALONSO GOMEZ,
CLAUDIA EUGENIA SIERRA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

**(October 23, 2006)**

Before BLACK, CARNES and BARKETT, Circuit Judges.

PER CURIAM:

Jorge Alonso Gomez and his wife, Claudia Eugenia Sierra, both nationals and citizens of Colombia, seek review of the Board of Immigration Appeals' decision adopting and affirming the Immigration Judge's orders of removal and denial of asylum, withholding of removal under the Immigration and Nationality Act (INA), and denial of relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT). The IJ found that: (1) Gomez and Sierra's application for asylum was untimely and that they could not demonstrate extraordinary circumstances excusing this delay, (2) withholding of removal was inappropriate because Gomez and Sierra could not demonstrate a clear probability of future persecution, and (3) the CAT did not apply because the alleged persecution was not at the hands of a public official. The BIA issued a brief opinion adopting and affirming the IJ's decision. Gomez and Sierra have petitioned this Court to review the BIA's denial of their asylum and withholding of removal applications.

Generally, we review only the decision of the BIA. Chacon-Botero v. U.S. Att'y Gen., 427 F.3d 954, 956 (11th Cir. 2005). However, where the BIA expressly adopts the IJ's reasoning, we also review the IJ's decision. Id. We review the factual determinations in each decision under the substantial evidence test. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001). Under that test, which is "highly deferential," we "must affirm the [IJ's] decision if it is

2

supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (quotation omitted). In order to reverse, "we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003).

## I.

Gomez and Sierra came to the United States from Colombia on July 10, 2000 for their honeymoon. Gomez testified that the couple chose to get out of Colombia in part because he was threatened by guerrillas working for the Revolutionary Armed Forces of Colombia (FARC). He explained that in September of 1998 he began working as a weekend volunteer for Acarpin, an institution dedicated to helping displaced children. Apparently, helping children adapt to society discourages them from joining armed revolutionary groups, and FARC became concerned that Acarpin was stifling its recruiting efforts. Gomez testified that both he and his aunt began to receive threatening phone calls. In April 1999, his aunt received a call from the FARC informing her that the group was aware of her and her nephew's involvement with Acarpin. In October 1999, a male FARC member called Gomez, warning him that if he continued his volunteer work, his whole family could suffer. The caller identified Gomez's siblings and parents by name, and warned him not to file a police report. In May 2000, a caller told Gomez that if he and his aunt continued to work for Acarpin, his wife and

3

family would be killed. Allegedly as a result of these phone calls, Gomez scaled back his involvement with Acarpin, continuing to help with fund-raising but no longer donating his time on weekends.[1]

Gomez alleged that his problems with the FARC continued after he entered the United States. During his honeymoon, his father called to tell him that unidentified men came to Gomez's office asking for him. Then, on September 22, 2001, the FARC kidnapped his aunt and two other people, releasing her two months later. Gomez explained that several factors led to his aunt's release, including protests by locals, his aunt becoming ill, and his aunt's promise to stop working for Acarpin.

## II.

We first address Gomez and Sierra's application for asylum. An asylum application must be filed within one year after an alien arrives in the United States. 8 U.S.C. § 1158(a)(2)(B). However, an otherwise untimely application may be considered timely if the alien demonstrates changed circumstances which materially affect the applicant's eligibility for relief or extraordinary circumstances justifying a delayed application. 8 U.S.C. § 1158(a)(2)(D); See Mendoza, 327 F.3d

---

[1] In Gomez' brief, he argues that "[a]fter Mr. Gomez was threatened by the FARC telephonically. . . he continued to work with the organization after 1998 as a fundraiser." This assertion is somewhat inconsistent with his statements that the phone calls occurred in 1999 and 2000.

at 1287. We only have subject-matter jurisdiction over appeals of timely applications. Chacon-Botero, 427 F.3d at 956. We review dismissals for lack of subject-matter jurisdiction de novo. Gonzalez-Oropeza v. U.S. Att'y Gen., 321 F.3d 1331, 1332 (11th Cir. 2003).

Gomez and Sierra filed their application more than one year after arriving in the United States. Gomez explained that he did not file an asylum claim earlier because he did not know how the process worked. The IJ found this explanation insufficient to establish extraordinary circumstances. The court reasoned that Gomez lived in an area that had between 100,000 and 200,000 Colombians, a Colombian radio station, Colombian papers, and several Spanish networks that regularly provided immigrants with information about asylum law. It also found that Gomez was "a sophisticated individual with a university degree" and that "there is nothing to indicate that he is a person who lacks the sophistication to find . . . information as to how to remain lawful in this country." There are no extraordinary circumstances to excuse the untimeliness of the asylum application. We thus have no jurisdiction to review their appeal of its denial. See Chacon-Botero, 427 F.3d at 957.

### III.

We next address Gomez and Sierra's application for withholding of removal. Under the INA, applicants seeking withholding of removal bear the burden of

showing that they are more likely than not to face persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Mendoza, 327 F.3d at 1287 (citing 8 U.S.C. § 1231(b)(3)(A)); see also I.N.S. v. Elias-Zacarias, 502 U.S. 478, 482-83, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992). We have explained that "persecution" is "an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that [m]ere harassment does not amount to persecution." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (quotations omitted) (finding that "menacing" telephone calls and threats to the alien and her brother did not constitute past persecution).

The IJ found "that the respondent's testimony was not sufficiently detailed, consistent or believable to provide a plausible and coherent account of the basis for his fears." That decision "is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1283-84. Gomez has not demonstrated that he is more likely than not to face persecution. His only evidence of past persecution included three telephone calls, one of which actually came to his aunt, and a visit to his office by three unidentified men. We have previously held that telephone calls alone do not constitute persecution. See Sepulveda, 401 F.3d at 1231.

Gomez's evidence of the possibility of future persecution is his aunt's

6

kidnapping.  The kidnapping of a family member could, in some circumstances, demonstrate a strong likelihood of persecution.  Here it does not.  The IJ found that Gomez presented no evidence that the kidnapping was related to his aunt's work with Acarpin, no explanation as to why she was kidnapped with two other people, and no credible evidence that he also would be kidnapped.  Gomez asserted that the kidnapping was in retaliation for his work with Acarpin.  However, this explanation is doubtful, because Gomez stopped his work with Acarpin and left Colombia more than a year before the kidnapping took place.  Gomez presumably could have presented an affidavit from his aunt explaining the circumstances surrounding her kidnapping, but he did not do so and he did not explain his failure to do so.  Meanwhile, his aunt's ordeal ended in 2001 and she has continued to live in Gomez's home town for the past four years without incident.  An alien's allegations of future threats are less persuasive if his family remains in his home country without incident.  See Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1259 (11th Cir. 2006).  Thus, even if Gomez could demonstrate that his aunt's kidnapping was related to his work with Acarpin, he cannot demonstrate that he is more likely than not to face further persecution if he returns to Colombia.

For the foregoing reasons, we dismiss Gomez and Sierra's petition as to their asylum claim and deny their petition as to their removal claim.

**DISMISSED in part,  DENIED in part.**

7