[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 4, 2011
JOHN LEY
CLERK

No. 10-13252
Non-Argument Calendar

_____

Agency No. A088-402-342


ELIZABETH CECILIA FERREIRA-CASTILLO,
LUIS MANUEL CASTILLO LIRA,
VANESSA C. CASTILLO FERREIRA,
VALENTINA V. CASTILLO FERREIRA,

                                        Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                        Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(April 4, 2011)

Before TJOFLAT, CARNES and FAY, Circuit Judges.

PER CURIAM:

Elizabeth Cecilia Ferreira-Castillo, a native and citizen of Venezuela, petitions for review of the denial of her request for withholding of removal under the Immigration and Nationality Act ("INA"). She argues that the Board of Immigration Appeals ("BIA") erred in concluding that her testimony in support of her application was incredible. She further acknowledges that derivative withholding-of-removal benefits are not available to her husband and daughters, and asks us to remand their cases to the Immigration Court so that they may file individual applications for asylum and withholding of removal. For the reasons set forth below, we grant the petition for review with respect to Ferreira-Castillo and remand, but we dismiss the petition with respect to the remaining petitioners.

I.

Ferreira-Castillo entered the United States in July 2005 on a nonimmigrant visitor visa, with authorization to remain until January 2006. In 2007, she was served with a Notice to Appear that charged her with overstaying her visa, in violation of INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). Her husband, Luis Manuel Castillo Lira, and their daughters, Valentina and Vanessa Castillo Ferreira, had entered the United States on visitor visas at various times and also were charged under INA § 237(a)(1)(B). Ferreira-Castillo admitted the allegations and conceded removability.

In April 2007, Ferreira-Castillo filed an asylum application that named Castillo Lira, Valentina, and Vanessa as applicants for derivative benefits. She sought asylum based on political opinion and membership in a particular social group. In a written statement, Ferreira-Castillo asserted that, when Hugo Chavez announced his candidacy for the presidency in 1998, she began to work for Project Venezuela, the party that had nominated Chavez's opponent. Chavez won the election, but Ferreira-Castillo continued to work for Project Venezuela, and in May 2000, the party nominated her and several coworkers for the elections for the local neighborhood association. Ferreira-Castillo was elected Treasurer, and her coworkers, Carmen Zamora and Adon Rosello, were elected President and Vice President, respectively. Ferreira-Castillo was in charge of administering monies that had been appropriated for reconstruction of an area that had been devastated by a landslide the previous December.

In Spring 2001, when Zamora unexpectedly resigned the presidency of the association and was appointed Chief of the Educative Zone for the state, Ferreira-Castillo subsequently learned that Zamora had secretly been a supporter of the Chavez government. The Bolivarian Circles were created in June 2001, and in December, Zamora was tasked with integrating the Bolivarian Circles into the communities through creation of the "Robinson Mission." In mid-January 2002,

Zamora went to Ferreira-Castillo's home with three individuals wearing the uniforms and red berets of the Bolivarian Circles. One of the uniformed men told her that Zamora had informed them of Ferreira-Castillo's ability to influence the council members and to modify the budget and solicit appropriations in a "very particular" manner to assist the Bolivarian Circles. She refused the proposal, explaining that the reconstruction effort was the first priority and the budget could not be modified, especially if the modification was for the profit of the Bolivarian Circles. The man said, "Mrs. Castillo, we have not come here to ask you this as a favor, you have to do this." He said that they worked for the Robinson Mission and presented a letter from the General Coordinator, soliciting her obligatory collaboration and her professional services as a professor in support of Chavez and the revolutionary process. Zamora told her that she should reconsider her position and that they would be in contact with her.

At the beginning of February 2002, Zamora called Ferreira-Castillo to ask whether she had reconsidered her position. Ferreira-Castillo said that she was going to be on work-related travel on the day that the mission was to begin, and that, at the moment, they were unable to obtain the requested appropriations. Over the next two weeks leading up to the start of the mission, Zamora's husband called three times to solicit her collaboration. Each time, she said that she would be

4

away from home on work-related travel.  As the date approached for the mission to begin, a man called her at home one evening and said,

> Mrs. Castillo, we have been observing you and we know you have not left the zone during these two weeks.  We have been following you including to your place of work and we know your office is in Maiquetia in the Building Central Caribe Vargas, you have lied to the Bolivarian Circles when you objected to helping us because you were traveling.  Mrs. Castillo we want you to know, either you are with us or against us.  "Country or death."

The man immediately hung up without identifying himself.  She cried when she told her husband, Castillo Lira, what had happened.

On May 5th, she received a call on her cell phone and recognized the speaker's voice as the same person who had called her the last time.  He asked her "what had happened with the solicitation of [her] professional support" and told her not to forget about the budget they were urgently awaiting.  She told him that she would be going to Europe on May 10th and that they could discuss the matter after she returned.  While she was in Europe for two weeks, Zamora's husband and another man visited both Ferreira-Castillo's home and her office to determine whether she was really on a trip.  When Castillo Lira told them where she was, Zamora's husband said, "We hope this time it is true, because we are not playing."

On June 11th, Ferreira-Castillo and her family drove to her youngest daughter's sports competition in another city.  After the match, they found that

5

their truck had been stolen from its parking space and, in its place, there was a note that read, "Long life to the Bolivarian Circles . . . Country or death." They filed a report, but the official ignored the note and suggested that the theft might have been related to "the underworld." They decided to spend the summer in hiding at a friend's apartment in the city of Catia La Mar, but they continued to receive telephone calls in which the callers would threaten that they would find the family.

The family returned home when the girls' school began at the end of the summer. One day in November, Ferreira-Castillo drove one of the girls to school and went inside for about 15 minutes to pay the tuition. When she returned to her car, there was a note on the windshield reading, "We are observing you and your husband and your daughters, you darn squalid. We are going to screw you over. Long life to the Bolivarian Circles." She did not see anyone nearby. She ran into the school, showed the note to the director, and asked them not to let her daughter ride the bus or leave school with anyone except her or Castillo Lira. In her "rage and impotence," she destroyed and discarded the note. She was too nervous to drive and had to wait at the school for half an hour until Castillo Lira could pick her up. She immediately asked him to go to their other daughter's school in order

6

to tell them that the girl could no longer ride the bus and could only leave with a parent.

In December, the family was driving home from a shopping trip in Caracas when a truck passed close by them in the left lane, then slowed down and moved toward the family's car. Castillo Lira slowed down to avoid the ravine on the right side of the car, the girls began to scream and cry, and Ferreira-Castillo yelled for the girls to duck down. As they approached a tunnel and roadblock, the truck had no choice but to pull ahead of them. The incident happened too quickly for them to see the license plates or identify the driver, but Castillo Lira saw that the passenger in the truck was wearing a red beret and yelling at them. They stopped at the roadblock and an official asked why they were so upset. He began to help them make a report, but when Castillo Lira said that the passenger was wearing a red beret with "MVR" on the front, the official said that it was probably a drunk driver and that they should be cautious.

In 2003, Ferreira-Castillo began to work on the referendum to recall Chavez. The party encouraged her to become a candidate for state councilor, in light of her good work on the local council, though the plan was not made concrete at that time. The threats to Ferreira-Castillo and her family were "accentuated" due to her activities, and on two occasions, they noticed a vehicle

stopping in front of their house in the early-morning hours and waiting for some time with the engine turned on. One morning around 4:00, Castillo Lira heard a car engine running and looked outside a window, upon which he heard someone scream, "Darn squalid you won't get very far, it's better for you not to continue." That day, because their security was at risk, they decided to go to Caracas to stay with Ferreira-Castillo's brother. The situation was upsetting to the entire family and eventually led them to see a psychologist.

One day in April 2003, a woman came to Ferreira-Castillo's office and told her, "Mrs. Castillo, this is not a courtesy visit, because the time of begging you has been wasted[.] I simply come to tell you that you are a darn squalid for having signed against our President Chavez and for not having collaborated with us, be very attentive." The woman turned and left. Ferreira-Castillo and Castillo Lira immediately took their daughters out of school and returned to her brother's home. She called her secretary and instructed her to close the office and not to return until further notice. The next day, a man called Ferreira-Castillo's cell phone and said, "Darn squalid and oligarch, there is no way that you can hide from us. We will screw you over for disobeying and not collaborating with the revolution." Ferreira-Castillo did not know what to do, but she had a commitment to fulfill, so

8

she reduced her workweek to three days to spend more time with her family and "shelter" herself.

On June 1, 2003, she dropped her husband off at the office so that he could catch up on some pending payments, took their older daughter to school for graduation rehearsal, then returned to the office and parked in the parking deck. As she was waiting at the elevator, she saw that a man and woman in Bolivarian Circles uniforms were standing next to her. The woman grabbed her hair, pushed her against the wall, and hit her on her right side, saying, "You have a pending debt with us and our revolution." The woman then grabbed her by the chest and continued hitting her in the face and stomach. Finally, the man hit her on the right side of the head with a hard object and pushed her down the stairs. Blood was running down her face, she felt dizzy, and a strong pain in her back almost prevented her from moving. An ambulance was called and she was taken to a clinic, where they had to operate on her. She also had to undergo rehabilitative therapy.

Ferreira-Castillo and her family wanted to leave the country immediately because of the attack. She could not leave because of her physical condition, but they were able to send their older daughter to the United States to stay with an aunt. Ferreira-Castillo did not ask for protection or file a report because the police

and the government are controlled by supporters of Chavez. Three months after her operation, she returned to her brother's home in Caracas, where she continued her therapy and resumed seeing the psychologist. Although she was recuperating satisfactorily, she was not in a condition to resume her activities, and Castillo Lira had to take charge of the family business and of taking their younger daughter to her new school.

In December 2003, the family moved back to their friend's home in Catia La Mar. That month, Castillo Lira received a phone call at work, in which an unidentified man said, "Now it[']s your turn, darn squalid[,] and you will not be able to tell." Castillo Lira immediately returned home, and they decided to close the office permanently and work from home.

In May 2004, enough signatures had been obtained for the recall referendum to be called. With medical permission, Ferreira-Castillo began to resume very limited activities in that regard. Ferreira-Castillo's statement indicates that she maintained her aspiration of running for state councilor. Sometime that summer, they decided to return to their own home. The recall referendum was held in August. The threats against her family resumed more forcefully, both because of her support for the referendum and because she had aspirations for higher political office. In September, a man called Castillo Lira and said, "If you do not convince

your wife to disappear, then we will make you and the rest of your family disappear, but indefinitely." This threat, along with the physical attack, made them realize that they could be killed at any moment. They began planning their flight from the country to save their lives.

Ferreira-Castillo attached several supporting documents to her asylum application, including the letter that was presented to her in January 2002 soliciting her collaboration with the Robinson Mission. The resignation letter that she submitted to the community association in July 2005 indicated that she had held the position of Treasurer since her election in May 2000. A letter from the Regional Coordinator of Project Venezuela stated that Ferreira-Castillo had been an active member of the party since 2000. Medical reports indicated that Ferreira-Castillo was admitted to the hospital on June 1, 2003, after falling down a flight of stairs. She had multiple sores on her face, a hematoma in her back, and trauma to the "labial region," scalp, and right wrist. She had pain and functional limitation in her wrist and back. She required surgery to treat the trauma to her back. Ferreira-Castillo also attached a copy of the note she had given to her daughter Vanessa's school, forbidding Vanessa to leave school unless accompanied by a family member, due to the threatening note Ferreira-Castillo had received.

At the asylum hearing, Ferreira-Castillo testified that she and her husband owned an air-and-sea transportation business and that she worked for Proyecto Venezuela, one of the country's main political parties. She started as part of the ladies' committee of the party in 1998, but in 2000, she began work as an active member of the party and became Treasurer of the community board. She was paid a salary of approximately $400 per month for her work. She worked for Proyecto Venezuela, specifically in her capacity as Treasurer of the community board, until 2005. When the Immigration Judge ("IJ") said, "I'm trying to find out if you were an employee of Proyecto Venezuela . . . or just whether you volunteered for the organization, Ferreira-Castillo replied, "I was an employee." She used to work as a teacher, but from the time that she and her husband opened the transportation business, she worked exclusively for their business and for the political party. She came to the United States in July 2005 because of the physical, psychological, and verbal threats she had received from the Bolivarian Circles.

Ferreira-Castillo testified that her problems in Venezuela began in mid-January 2002, when Zamora, a woman, and two men came to her house to request her collaboration. She described that incident and the follow-up phone calls from Zamora, Zamora's husband, and unidentified strangers, including her attempt to avoid the situation by lying that she was going on a trip. She did not report the

12

calls because she did not think anything worse would happen and that they would leave her alone after the mission had begun. On May 5th, though, after the mission had begun, a person called and asked her what had happened to her collaboration with the mission. She had a legitimate business trip scheduled for May 10th, so she told the man that they could discuss it when she returned. She testified to the visits paid to Castillo Lira and the secretary while she was away.

Ferreira-Castillo further testified to the incident in which Castillo Lira's truck was stolen from its space outside Valentina's sporting event, and a note was left in its place that read, "[L]ong life to the Bolivarian Circles, . . . homeland or dead." They reported the incident to the police and provided the note as evidence. The police wrote a report but said that it was just a common crime. The car was never found. She described their first, three-month move to Catia La Mar and the fact that they continued to receive several phone calls during that period. The callers would say that they would find the family wherever the family went. Ferreira-Castillo testified, "[W]e were practically terrorized at the time." She then described the incident in November 2002 when someone left a note on her car while she was inside Valentina's school. She identified the note she had written to Vanessa's school explaining the incident and requiring that Vanessa only leave school with a family member. She noted that someone from the school had signed

it to acknowledge that they had received it. She testified that she had reported the incident to the police and that they told her to notify them if she saw a stranger lurking around the house, but nothing else happened.

Ferreira-Castillo also testified to the incident in December 2002 when a van or truck, carrying an individual wearing a red Bolivarian Circles beret, started to run their car off the road. She believed that she was still being followed at that time because she had refused to collaborate with the Bolivarian Circles and they knew that she was active in the Proyecto Venezuela party.

Counsel asked whether Ferreira-Castillo had ever been a candidate for Proyecto Venezuela. Ferreira-Castillo said that the party approached her at the beginning of 2003 with the offer of running in the August 2005 elections. At that time, they merely looked at the possibility. She finally decided in May 2003 to accept their offer and become a candidate. Between January and May 2003, cars would stop in front of the house at various times of day and would sit with the engine running. On one occasion, her husband looked out the window at such a car and a man said, "[Y]ou damn squalid, you better not continue because you're not going to get far." She knew that the comment was directed at her because the car was directly in front of her house and she was the only one working for a political party. She did not report these incidents to the police because she was

14

scared, the previous police reports had been useless, and she had come to realize that the reports would not be taken seriously because everyone in law enforcement was aligned with the government.

Ferreira-Castillo testified that the phone calls became more frequent after she accepted the invitation to become a candidate, as her political aspirations now included becoming a councilor rather than merely serving as part of the community association. Sometime around May 2003, an unidentified woman came to the office to tell her that the time for begging had expired and that she should pay attention and beware. The next day, an unidentified man called her at home and told her to pay attention because she had not collaborated with the revolution. Ferreira-Castillo then described the June 1, 2003, attack on her in the parking garage. After the attack, a security guard found her and called her husband. Her husband called the ambulance that took her to the hospital. She had surgery on her back and was in the hospital for four or five days. She required approximately two years of rehabilitative therapy.

During that time, the family lived with Ferreira-Castillo's brother in Caracas. People began to make threatening phone calls to her husband. In December 2003, the family moved back to their friend's house in Catia La Mar. While they were in Catia La Mar, her husband received a cell phone call in which

15

the caller said that this time they would go against him and he would not live to tell about it. She testified that they called her husband in order to pressure him to convince her to abandon her political aspirations and her candidacy for Councilor. She was still a candidate during her rehabilitation, but she engaged only in very limited activities from her home.

In 2004, she and her husband continued receiving threatening phone calls, despite changing their phone numbers. In September 2004, a caller told her husband that if he could not convince her to abandon her political aspirations, the family would all disappear for good. She reported this call to the police, who made a report but did not give her a copy. After that, the phone calls continued. Ferreira-Castillo tried to hide at her in-laws' home, but people tried to find her there. She left the country in July 2005. She remained afraid to go back to Venezuela because they could kill her and her family. She said that the company for which her brother works was taken over by the government, and "[t]hey linked him to [her], and he is also being attacked" or threatened. The woman who is renting Ferreira-Castillo's house has told her that people still go to the house looking for her.

On cross-examination, the government noted that she had submitted a letter from the political party, which did not mention that she was a candidate for an

16

elected position. She said that she had only asked for a letter that would indicate that she was a member of the party, and it was not intended as a confirmation of her candidacy.

Castillo Lira testified to the incident when the truck tried to run their car off the road and the time in September 2002 when the Bolivarian Circles left a pamphlet on the windshield of Ferreira-Castillo's car. He also described receiving the call from the security guard on June 1, 2003, and finding Ferreira-Castillo bleeding on the floor of the parking garage. He said that his wife was being threatened because she was a political activist for the Proyecto Venezuela party. She had been a member for three years prior to the attack. He testified that he received a phone call in September 2004 in which a member of the Bolivarian Circles threatened to strike against Castillo Lira or his family if he did not force Ferreira-Castillo to stop her political pretensions. The caller wanted her to stop being a political militant and to stop running for the Councilor position. Other intimidating callers, who called him early in 2003, also identified themselves as members of the Bolivarian Circles or the Fifth Republic Movement. At other times, he had a feeling they were being followed at home because he would see unfamiliar cars in the neighborhood. The people in the cars did not identify

themselves or say anything.  The family moved three or four times in an attempt to avoid being followed or persecuted.

The IJ asked Castillo Lira whether Ferreira-Castillo worked in Venezuela. He said that she worked at his business and was a teacher.  The following exchange then took place:

> Q. Other than as a substitute teacher and at your business, did your wife work anywhere else?
> A. She was a political militant.
> Q. Did she, did she work anywhere else for a salary, sir?
> A. No.  Just that.
> Q. What about with the civic organization?  Did she work for a civic organization?
> A. Yeah, the community association.
> Q. Now that was, was that a job or just serving, . . . or did she serve as a treasurer?
> A. Well she was just a treasurer and I believe she got a salary for that.
> Q. Did she get a salary—or did she work also as—other than . . . the salary that she got for the civic organization, did she get any other money from any other organization in Venezuela?
> A. No.
> Q. She was, you said she was an activist for Proyecto Venezuela.  Is that correct?
> A. Correct.
> Q. And what [did she] do for Proyecto Venezuela?
> A. Well she was a political militant.  She would hold meetings and go to public activities and marches, and in fact, against the, the president of the republic in Venezuela.
> Q. Was she ever an employee of the Proyecto Venezuela?
> A. No.  Political militant but that was, that's not a business enterprise.  It's just a political party.

The IJ denied the claim for asylum on the ground that the application was pretermitted as time-barred. The IJ also denied withholding of removal and ordered Ferreira-Castillo and her family removed to Venezuela. He found that her experiences did not rise to the level of past persecution and that she had not established that she was more likely than not to be persecuted in the future. In particular, he found that the threats she received between 2002 and May 2003, in connection with her refusal to collaborate with respect to the community association's budget, were not sufficiently significant to constitute persecution. There was little evidence that she had experienced anything other than threats in connection with this incident. The threats she had received after becoming a candidate for office also did not constitute persecution. As to the June 2003 incident, the IJ considered it an isolated incident after which she was never physically harmed, and it appeared that the severity of her injuries was due to the exacerbation of a preexisting condition. The subsequent threatening phone calls that she and her husband received did not rise to the level of persecution.

The IJ further noted that, "aside from the merits of [her] claim, . . . there [wa]s a threshold issue of credibility." He found that neither Ferreira-Castillo's application nor the letter from Proyecto Venezuela had mentioned her candidacy, her application had not mentioned her employment by the party, and Castillo Lira

19

testified that she was not an employee of the party. The IJ also found that the claim that she was being targeted because of her association with the party was "somewhat implausible."

The BIA dismissed Ferreira-Castillo's appeal. First, it concluded that her asylum claim was time-barred. As to her claim for withholding of removal, the BIA stated that her credibility was to be judged in light of the totality of the circumstances and such a determination may be based on any inaccuracies or falsehoods, regardless of whether such inaccuracies or falsehoods go to the heart of her claim. Ferreira-Castillo had not indicated in her application that she was a candidate for the Proyecto Venezuela party, and the letter from the party did not mention her candidacy. Furthermore, although she had testified that she was employed by the party, that information was not included in her application, and her husband had said that she was not employed by the party. As "a single inconsistency may result in a finding that the respondent is not credible," the credibility determination was correct and Ferreira-Castillo was ineligible for relief.

II.

We review the BIA's decision, except to the extent that it expressly adopts the IJ's opinion or relies upon his reasoning. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). Here, the BIA wrote a separate opinion addressing only the

matter of Ferreira-Castillo's credibility, which agreed with the IJ's findings without clearly relying upon them. Accordingly, we review only the BIA's opinion. We will not reverse the BIA "unless the record compels a contrary conclusion." *De Santamaria v. U.S. Attorney Gen.*, 525 F.3d 999, 1006 (11th Cir. 2008).

Factual determinations are reviewed under the substantial evidence test, which requires us to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (*en banc*). "We must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1027 (quoting *Al Najjar*, 257 F.3d at 1283-84) (quotation marks omitted).

Credibility determinations are reviewed under the substantial evidence standard. *Ruiz v. U.S. Attorney Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006). We may not substitute our judgment for that of the factfinder when reviewing credibility findings. *Id.* "Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." *Id.* Once the factfinder has made an adverse credibility finding, the applicant bears the burden of showing that the finding was not supported by

21

specific, cogent reasons or was not based on substantial evidence. *Id.* An adverse credibility determination alone can be sufficient to support a denial of relief. *Id.* (quoting *Forgue v. U.S. Attorney Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005)). However, if the applicant produces evidence in addition to her own testimony, the factfinder has a duty to review that evidence; he may not rely only on the adverse credibility determination in deciding whether to grant relief. *Id.* (quoting *Forgue*, 401 F.3d at 1287).

For asylum applications filed after May 11, 2005,[1] the REAL ID Act states that factfinders are to consider the totality of the circumstances when making credibility determinations. 8 U.S.C. § 1158(b)(1)(B)(iii). Those circumstances can include the witness's demeanor, candor, and responsiveness, the inherent plausibility of the account, the consistency among and within all oral and written statements and other evidence, and any inaccuracies and falsehoods in the statements. *Id.* These determinations are to be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." *Id.*

The BIA based its credibility analysis on two factors. First, it stated that neither Ferreira-Castillo's written statement nor the letter from the Regional

---

[1] *See* Pub. L. No. 109-13, § 101(h)(2), 119 Stat. 305.

22

Coordinator of the party mentioned that she was a candidate for the statewide Councilor position. However, the written statement said that she began to study the possibility of a candidacy when the party first approached her early in 2003 about running for the position. The statement said that she greatly limited her political activities after the June 2003 attack, but in May 2004, she began to resume limited activity and she aspired to run for the Councilor position. It stated that the threats against her family intensified due to both her work on the referendum and her aspirations to higher office. Although her application did not explicitly state whether or when she formally announced her candidacy, or when she made the final decision to run, it did make clear that she intended to run for office and that her aspirations were known widely enough that the Bolivarian Circles attempted to suppress them.

This description of her political aspirations is entirely consistent with her testimony, including her frequent references in the hearing to her "pretensions" to the Councilor position, her testimony that she greatly limited her political activities during her recuperation from the June 2003 attack, her failure to mention whether or when she formally announced her candidacy for the office, and her assertion that the threats increased due to her aspirations for higher office. This was corroborated by Castillo Lira, who testified that a caller in September 2004

23

wanted him to force Ferreira-Castillo to abandon her "political pretensions," meaning to stop running for the Councilor position. The only added detail in Ferreira-Castillo's testimony was the month in which she finally decided to accept the party's offer to run on its ticket. This is, at most, an elaboration that fails to contradict or embellish her previous description of her activities. Furthermore, while the letter from the party does not specifically mention her candidacy, it also does not describe her successful candidacy for Treasurer of the community association, any of her other political activities, or any details of her role in the party. The letter is merely a one-sentence confirmation of the fact that she had been an active member of the party since 2000, which is consistent with Ferreira-Castillo's testimony. Nothing in the letter contradicts, either explicitly or by omission, her assertion that she was going to run for Councilor on the party's ticket.

Second, the BIA found that Ferreira-Castillo's written statement did not indicate that she was employed by the party and that Castillo Lira said that she was not employed by the party. Her statement asserted that she was "working" for the party and described her fellow candidates in the 2000 election as her "coworkers." The statement was silent as to whether she was paid for her work. She testified consistently with the statement, saying repeatedly that she worked for the party as

24

an active member. She described her "work" after leaving the ladies' committee as consisting largely of her position as Treasurer of the community association. She testified that she received a monthly salary, but did not specify the date on which she began to receive the salary. Again, the detail that she received a stipend for her work was an elaboration that neither contradicted nor embellished the information in her statement, and it was corroborated by Castillo Lira's testimony that she was paid for her work as Treasurer, which Ferreira-Castillo considered to be part of her work for the party.

The issue of whether to apply the term "employee" to Ferreira-Castillo's work was a distinction introduced by the IJ himself, when he asked Ferreira-Castillo to specify whether she was "an employee . . . or just a . . . volunteer[]" and, as a result, she chose to identify herself as an employee. Her failure to use the IJ's terminology in her written statement did not render the statement inconsistent with her testimony, in which she consistently used only the word "work" until the IJ asked her to do otherwise. As to Castillo Lira's testimony on this point, the IJ asked Castillo Lira whether Ferreira-Castillo was an employee of the party, but he did not frame the question to Castillo Lira as a choice between employment and volunteer work. Castillo Lira responded that she was not an employee of the party because a political party is "not a business enterprise."

25

Even deferring to the BIA's view of this discrepancy as a true contradiction rather than a mere difference in understanding of how the IJ used the word "employee," this single, minor discrepancy does not rise to the level of substantial evidence that would support a finding, under the totality of the circumstances and in view of the whole record, that Ferreira-Castillo's lengthy, detailed, thorough, and consistent testimony and statement, corroborated by documentary evidence and the rest of Castillo Lira's testimony, was nevertheless incredible. *See* § 1158(b)(1)(B)(iii); *Ruiz*, 440 F.3d at 1255; *Adefemi*, 386 F.3d at 1027. Therefore, the record compels the conclusion that the adverse credibility determination was incorrect. *See De Santamaria*, 525 F.3d at 1006.

### III.

Ferreira-Castillo is correct that withholding of removal does not provide for derivative benefits for her husband and daughters. *See* 8 C.F.R. § 208.16(c); *Delgado v. U.S. Attorney Gen.*, 487 F.3d 855, 862 (11th Cir. 2007). We do not have authority under which we may grant their petitions nevertheless and remand for the purpose of permitting them to file independent asylum applications. Rather, a request to reopen the removal proceedings for the presentation of new evidence must be made to the BIA in the form of a written motion to reopen. *See* 8 U.S.C. § 1229a(c)(7), 8 C.F.R. § 1003.2(a).

For the foregoing reasons, we grant the petition as to Ferreira-Castillo, remand to the BIA as to her, and dismiss the petition as to the other petitioners.

**PETITION GRANTED IN PART, DISMISSED IN PART, AND REMANDED.**