[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 26, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-10582
Non-Argument Calendar

_____

BIA No. A95-546-805

JAIME ANDRES CORREA VANEGAS,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(October 26, 2006)**

Before TJOFLAT, CARNES and PRYOR, Circuit Judges.

PER CURIAM:

Jaime Andres Correa Vanegas, a Colombian citizen and national, petitions this Court for review of the final order of the Board of Immigration Appeals (BIA). The BIA's order affirmed an Immigration Judge's (IJ's) denial of his applications for asylum and withholding of removal under the Immigration and Nationality Act (INA). 8 U.S.C. §§ 1158, 1231(b)(3)(A). Because this Court lacks subject matter jurisdiction to review the IJ's finding that Correa did not file a timely application for asylum, we dismiss that part of his petition. And, because substantial evidence supports the IJ's decision not to withhold removal, we deny that part of the petition.

## I.

Correa entered the United States on January 15, 2001, without permission from the Immigration and Naturalization Service (INS).[1] On May 14, 2002, Correa filed an application for asylum under the INA and for withholding of removal under both the INA and the United Nations Convention Against Torture (CAT). On July 9, 2002, the INS served Correa with a notice to appear, charging him with removability as an alien present in the United States without being admitted or paroled. Correa admitted the charges, conceded removability, and appeared before

---

[1] The INS was abolished when President Bush signed the Homeland Security Act of 2002 (HSA). The HSA transferred the INS' functions to the newly created Department of Homeland Security (DHS). As this case began before the INS' abolishment, this opinion refers to the INS instead of the DHS.

the IJ on September 23, 2004, at a hearing to determine the merits of his application. At the hearing, Correa testified that the Revolutionary Armed Forces of Colombia (FARC) persecuted him in September and October of 2000 because of his anti-FARC political opinions. He maintained that the IJ should grant his applications for asylum and withholding of removal because he faced continued persecution in Colombia. The IJ denied Correa's application for asylum after determining that he had filed his application late. The IJ also denied Correa's application for withholding of removal, finding that Correa's testimony and documentary evidence lacked credibility.

At the hearing, Correa recounted the alleged persecution. The first incident occurred in September 2000 when three members of FARC showed up at his home. Initially, Correa said the visitors were males. Then, after a prompting from his attorney, Correa corrected himself, specifying that two of the visitors were male and one was female. They told him that their boss had been watching him and wanted him to join FARC. Correa said he rebuffed the invitation, told the visitors that he did not share their ideals, and informed them that he held FARC responsible for his father's murder in 1981. According to Correa, the visitors became angry and told him that he and his family were "at risk."

Correa testified that twenty days after FARC's initial visit, he received three

calls from a FARC militant. Correa told the IJ that his wife answered the first call, his mother answered the second, and he answered the third. He never spoke with the caller. When his wife and mother answered the phone, they told the caller that Correa was not home. When Correa answered, he hung up after the caller identified himself as a FARC militant. Correa further testified that in September 2000 two FARC militants attempted to murder him. Although he escaped the militants, the attack prompted Correa to send his wife and daughter to live with his mother-in-law in another part of Colombia. He decided to relocate to the United States. Initially, he applied to the INS for a tourist visa. After the INS denied his application, he paid a smuggler to sneak him across the U.S.-Mexican border.

The IJ found several inconsistencies in Correa's testimony. Despite ample opportunities, Correa could not explain them. For instance, when the IJ asked Correa if the FARC members who visited his home had asked him to do anything besides join FARC, Correa said no. The IJ replied that when members of FARC show up, they normally ask for more than allegiance; they ask for money, information, or other direct assistance. Correa then said that they also asked him to use his position as a real estate agent to provide them with information about the area. Later in the hearing, however, the IJ again asked what the members of FARC wanted, and Correa returned to his original position that the visitors asked him to

join FARC, but made no other requests.

Besides inconsistencies in Correa's testimony, the IJ also drew negative inferences from facts that he elicited from Correa. These facts include the following: (1) Correa left his wife and child in Colombia despite claiming in his asylum application that FARC had threatened all of them; (2) After the alleged attempt on his life, Correa kept his job for at least three months despite working in the same neighborhood where the alleged murder attempt occurred; (3) Correa testified that FARC murdered his brother in 2003 because his brother would not disclose Correa's whereabouts, but Correa produced no evidence connecting FARC to his brother's death; (4) Correa's mother did not testify in support of his testimony, even though she is a U.S. citizen, and he lived with her throughout the hearing; and (5) Correa's mother visits her family in Colombia every year, although FARC allegedly murdered her husband and one of her sons.

In addition to the inconsistencies and improbabilities in Correa's testimony, the IJ found numerous discrepancies between that testimony and Correa's asylum application. For example, in his asylum application Correa identified the three individuals who initially visited his home as males. At the hearing, Correa initially said that the visitors were male. However, after conferring with his attorney, he changed his account and said that two of the visitors were male and one was female.

Correa's asylum application also differs from his testimony regarding the timing, frequency, and content of the phone calls made by FARC. The asylum application states that a FARC militant called Correa eight days after FARC's visit, but at the hearing Correa said the calls came twenty days after the visit. Correa's asylum application further states that he received several calls, and that the caller told Correa that he had become a FARC military objective and that his family was in danger. At the hearing, however, Correa testified that he received only three calls and that the calls ended before any dialogue took place.

The asylum application also differed from Correa's testimony on several of the facts related to the alleged attempt on Correa's life. Correa's application lists October 19, 2000, as the date of the alleged attack, but at the hearing Correa said the attack occurred on September 19, 2000. When the IJ asked him to explain the discrepancy, Correa stated that he "began to feel pressure" from FARC in September, but the actual attack happened in October. The asylum application also states that the attempted murder happened at 8:00 p.m. as Correa arrived at his home, yet Correa testified that it occurred at 12:30 p.m. as he left his home.

The IJ's doubts were not limited to Correa's trial testimony and asylum application. The IJ also questioned the authenticity of a Columbian police report that Correa used to support his contentions. Correa says he filed the report with Colombian authorities at 2:00 p.m. on the day of the attempted murder. Correa's

6

application for asylum does not mention the report. Instead, Correa stated in his application that "he did not denounce the attempt on his life because he did not believe in Colombia's laws, because they are corrupt." In fact, Correa did not produce the report until almost seventeen months after he filed his application for asylum. Correa testified that he did not include the report in his initial application because he had forgotten about it. The IJ doubted that Correa could have forgotten such an important document. The IJ also pointed out that instead of using the report to amend his initial application, Correa filed it as a supplement to his application. If Correa had filed the report as an amendment, the INS might have investigated its authenticity. Thus, the IJ found that the report probably was "ginned up" after Correa began the asylum application process.

Even if the report was not fabricated, the statements it contains are inconsistent with both Correa's application for asylum and his testimony at the hearing. Correa's statement in the report says that FARC members tried to kill him around 12:30 p.m., while his application states that the attack occurred around 8:00 p.m. Additionally, the report listed October 19, 2000, as the date of the attempted murder, but Correa testified that the attack occurred on September 19, 2000.

After Correa offered no satisfactory explanation for the inconsistencies in his evidence, the IJ found that these inconsistencies "destroyed his credibility" and denied his application for withholding of removal. The BIA adopted and affirmed

the IJ's decision, and Correa now petitions for a review of the BIA's order.[2]

## II.

This Court reviews the BIA's legal conclusions de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247 (11th Cir. 2001). We review the BIA's factfindings under the substantial evidence test, which requires us to "affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2002) (quoting Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001)). Under the substantial evidence test, "we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Id. (quoting Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1035, 125 S. Ct. 2245 (2005)). The test is "highly deferential" and does not allow "re-weigh[ing] the evidence from scratch." Mazariegos v. U.S. Att'y Gen., 241 F.3d 1320, 1323 (11th Cir. 2001). Under the substantial evidence test, the record must not only support reversal, it must compel it. Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002).

We review only the BIA's decision, except for those portions of the IJ's decision expressly adopted by the BIA. Al Najjar, 257 F.3d at 1284. Here, the

---

[2] In his petition, Correa raises no argument concerning the denial of his claim for relief under CAT. Thus, this claim is abandoned. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

8

BIA expressly adopted the IJ's decision that Correa failed to file a timely application for asylum and failed to present sufficient credible evidence to carry his burdens of proof and persuasion in support of his application for withholding of removal. Thus, we review the IJ's findings under the substantial evidence test and will uphold those findings unless "any reasonable adjudicator would be compelled to conclude to the contrary." § 1252(b)(4)(B).

**III.**

In his petition for review, Correa raises two issues. First, Correa contends that the IJ erred in finding his application for asylum untimely. The government argues that this Court lacks subject matter jurisdiction to review the timeliness of Correa's application. The government is right.

As part of the asylum application process, an alien must demonstrate "by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." § 1158(a)(2)(B). If an alien files after the one-year deadline, his application may still be considered "if the alien demonstrates to the satisfaction of the Attorney General . . . extraordinary circumstances related to the delay in filing . . . ." § 1158(a)(2)(D). However, § 1158(a)(3) specifies that "no court shall have jurisdiction to review any determination of the Attorney General [under § 1158(a)(2)]." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003) (quoting § 1158(a)(3))

(alteration in original). We have held that the phrase "no court" in § 1158(a)(3) includes this Court. See id. Therefore, we lack subject matter jurisdiction to consider the timeliness of Correa's asylum application.

Correa's second contention is that the BIA erred in adopting the IJ's decision to allow Correa's removal. Because he found that Correa's evidence lacked credibility, the IJ determined that Correa did not meet his burdens of proof and persuasion under the INA. On appeal, Correa contends that his hearing testimony and the alleged police report constitute credible evidence that qualifies him for withholding of removal. The government, on the other hand, contends that the IJ's findings are supported by "substantial evidence," and that nothing in the record compels us to overturn the IJ's finding that Correa's testimony lacked credibility. Once again, the government is right.

Under the INA, Correa would qualify for withholding of removal if he could show that his life or freedom would be threatened in Colombia because of his race, religion, nationality, membership in a particular social group, or political opinion. § 1231(b)(3)(A). To meet this burden, Correa must show that upon returning to Colombia it is "more likely than not" that his life or freedom would be threatened on one of these grounds. Sepulveda, 401 F.3d at 1232. It is presumed that an alien's life or freedom will be threatened if he establishes that he suffered past persecution because of a reason enumerated in § 1231(b)(3)(A).

10

Correa contends that his trial testimony and the alleged police report establish that his anti-FARC ideals caused him to suffer past persecution, and that he "more likely than not" will suffer future persecution. The IJ, however, found that Correa's testimony lacked credibility and that the police report was untrustworthy. Although the IJ must offer "specific, cogent reasons" for an adverse credibility finding, we review his credibility determinations under the substantial evidence test, and we will not overturn those findings unless the record compels it. Forgue, 401 F.3d at 1287. Here, the IJ found numerous inconsistencies between Correa's asylum application, his oral testimony, and the alleged police report. The IJ also drew negative inferences from several parts of Correa's testimony, including Correa's willingness to leave his wife and child in Colombia. Our case law supports this inference. We have held that a petitioner's claim that he fears future persecution is contradicted by the fact that he has family members who remain in the country from which he fled. Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1259 (11th Cir. 2006). Additionally, the IJ found that none of Correa's evidence connected FARC to his brother's death.

Correa offers no substantive explanation for these inconsistencies and improbabilities. He simply asserts that his testimony was indeed credible and that the police report is indeed authentic. Given the IJ's specific notation of the problems with Correa's evidence, this Court finds nothing in the record that would

11

compel us to reverse the IJ's determination that Correa did not meet his burdens of proof and persuasion under § 1231(b)(3)(A).  As a result, it is not necessary for us to consider whether the alleged threats by FARC against Correa can be imputed to Correa's political opinion, and his petition for relief is denied.

**DISMISSED IN PART, DENIED IN PART**.