[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 22 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13968

_____

Agency No. A95-255-313

CARLOS AUGUSTO ALZATE-ZULETA,
FRANCY TRUJILLO,
JULIAN DAVID ALZATE,
CARLOS AUGUSTO ALZATE-TRUJILLO,
NATALIA ALZATE,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(June 22, 2007)**

Before BIRCH and FAY, Circuit Judges, and DUFFEY,* District Judge.

_____

* Honorable William S. Duffey, Jr., United States District Judge for the Northern District
of Georgia, sitting by designation.

PER CURIAM:

Petitioner Carlos Augusto Alzate[1] seeks review of the decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge ("IJ")'s order denying his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Alzate alleges that he was persecuted in his home country of Colombia on account of his membership in Colombia's Conservative Party. Because we find that Alzate has successfully demonstrated past persecution on account of a political opinion, we GRANT his petition for review, VACATE the decision of the IJ, as affirmed by the BIA, and REMAND for a determination of whether the government adduced sufficient evidence to establish, by a preponderance of the evidence, (1) that Alzate could avoid future persecution by relocating within Colombia, and (2) that, under all the circumstances, it would be reasonable for him to do so. See 8 C.F.R. § 208.13(b)(1)(i)(B).

## I. BACKGROUND

Alzate is a Colombian citizen and active in that country's Conservative Party. He came to the United States in 2001, and timely filed an application for

___

[1] Alzate's petition is derivative on behalf of his wife, Francy Trujillo, and his minor children, Julian David Alzate, Carlos Augusto Alzate, Jr., and Natalia Alzate. For convenience, this opinion refers to the petitioners collectively as "Alzate" or "Petitioner."

asylum, withholding of removal, and relief under the CAT.  At a merits hearing in April 2005, Alzate testified as to the basis of his claims for relief.

Alzate stated that while he was growing up, his "entire family" was active in the Conservative Party, and that he had personally been active in the party since his childhood.  After finishing high school in 1976, he obtained his first job through his involvement with the Conservative Party, and in 1984 he took a job in the government, which he "support[ed]" by "perform[ing] political activities."  AR at 84-85.  He later took another public-sector job that involved supervising "garbage collection, the cleaning of the streets, [and] the maintenance of vegetation in the city of Cali."  Id. at 86.  He testified that this was a political job connected to the Conservative Party.  Alzate stated that in addition to his duties as a supervisor of maintenance work, he also worked with youth through sports, social events, and political activities, as a way to involve them in their communities and prevent them from becoming involved in "subversive groups."  Id. at 89.

In 2000, Alzate began to receive threatening calls at his home from people who identified themselves as members of the guerrilla group known as the FARC.  He testified that his telephone number was publicly listed, and he could not delist it due to the requirements of his government job.  He recounted that the callers "[t]hreatened" him, and instructed him "to leave the area . . . to stay away from the youth . . . to get out of there, because [he] was a son of a bitch," and stated that if

3

he did not do so, "they were going to harm [him] and [his] family." Id. at 91. When the calls began, they occurred two to three times a week, but over time, the frequency of the calls increased. Alzate testified that the caller were pressuring him "to stay away from the area because [he] was working for democratic ideals" and because he "was working for one of the traditional parties of Colombia, the Conservative." Id. at 92. In addition to the telephone calls, Alzate's neighbors told him that "strange and unknown individuals" had been asking about Alzate and his family, and specifically inquiring as to when Alzate and his family typically came and went from the house. Id. at 92-93.

On 16 February 2001, Alzate was riding his motorcycle with his wife, when they were approached by two people wearing face masks and riding a black motorcycle. The individuals on the black motorcycle fired two gunshots at Alzate and his wife, who then dropped their motorcycle and ran into an alley asking for help. The assailants disappeared into traffic. Alzate used a portable radio to call a colleague, who then called the police. The police came to investigate, but did not find the assailants. Alzate did not file a formal police report, because he believed that doing so would increase his chances of being killed, due to infiltration of the police department by the FARC.

After the shooting incident, the threatening calls to Alzate's home increased. The callers identified themselves as FARC members, and at least one such call

4

explicitly referred to the shooting incident, telling Alzate that "next time [he is] not going to survive another attack," and that if he "didn't leave the area or district fast, they were going to kill [him] and [his] family." Id. at 96.

As a result of the shooting incident and the constant death threats, Alzate decided to leave his government job, and formed a private garbage collection company that contracted with the municipality. He believed that by leaving the public sector, he was no longer going to be "exposed to the constant danger . . . on the streets." Id. at 97. Despite his move to the private sector, however, "the calls continue[d] and the situation worsen[ed]." Id. Finally, as a result of the shooting and the constant threats from the FARC, Alzate decided to move his family to the United States.

After the hearing, the IJ delivered his opinion. He began by finding that Alzate's testimony was credible and consistent with his asylum application. Despite this finding, however, the IJ stated that Alzate had not established eligibility for asylum. The IJ relied primarily on two grounds: first, the IJ observed that the events in question "happened almost five years ago." Id. at 53. Second, the IJ stated that Alzate had not proven that he was unable to avoid persecution by relocating within Colombia. The IJ then reasoned that, because Alzate did not qualify for asylum, he could not meet the higher threshold applicable to claims for withholding of removal. Finally, the IJ stated that Alzate

5

had not been subjected to torture and therefore could not receive relief under the CAT. The BIA summarily affirmed the IJ's decision.

## II. DISCUSSION

When, as here, the BIA summarily affirms the IJ's decision without issuing a separate opinion, "the IJ's decision becomes the final removal order," and "[w]e review the IJ's decision as if it were the [BIA]'s." Alim v. Gonzales, 446 F.3d 1239, 1254 (11th Cir. 2006) (internal citations and quotations omitted). "[W]e must affirm the IJ's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005) (per curiam) (citation, quotation, and alteration omitted). This standard of review is highly deferential, and we will reverse the IJ's decision only if the evidence compels us to do so. Id.

An alien who arrives in, or is present in, the United States may apply for asylum, which the Attorney General has discretion to grant if the alien is a "refugee" as that term is defined in the Immigration and Nationality Act ("INA"). Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1257 (11th Cir. 2006) (per curiam) (citing INA § 208(a)(1), (b)(1), 8 U.S.C. § 1158(a)(1), (b)(1)). A "refugee" is defined, in pertinent part, as:

> any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of

6

persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). An asylum applicant "may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." 8 C.F.R. § 208.13(b). By demonstrating past persecution based on a protected ground, an applicant creates a rebuttable presumption that he or she has a well-founded fear of future persecution. Id., § 208.13(b)(1). The government may rebut that presumption by showing, by a preponderance of the evidence, that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and, under all the circumstances, it would be reasonable to expect the applicant to do so." Id., § 208.13(b)(1)(i)(B), (b)(1)(ii).[2]

We have held that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation." Sepulveda, 401 F.3d at 1231 (internal quotation omitted). "In determining whether an alien has suffered past persecution, the IJ must consider the cumulative effects of the incidents,"

---

[2] The government may also rebut the presumption by showing that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality." 8 C.F.R. § 208.13(b)(1)(i)(A). Here, however, the government has not sought to prove a fundamental change in circumstances, and on appeal the government raises only the issue of Alzate's ability to relocate. Accordingly, we do not address whether a "fundamental change in circumstances" has occurred in Colombia.

rather than viewing each incident in isolation. Delgado v. U.S. Att'y Gen., __ F.3d __, No. 05-16419, slip op. at 8 (11th Cir. May 25, 2007) (citing Ruiz v. U.S. Att'y Gen., 479 F.3d 762, 766 (11th Cir. 2007)).

The IJ erred in not finding that Alzate was subject to past persecution on account of his political opinion. Though persecution requires "more than a few isolated incidents of verbal harassment or intimidation," Sepulveda, 401 F.3d at 1231 (internal quotation omitted), the record in this case compels a finding of past persecution. Rather than "a few isolated incidents" of harassment, Alzate received repeated death threats from self-identified members of the FARC, and the threats occurred with increasing frequency until Alzate finally fled Colombia with his family. In addition to the verbal threats, Alzate's neighbors informed him that unknown individuals were asking about Alzate's and his family's habits with respect to coming and going from their home. The threats culminated in the attempted murder of Alzate and his wife in the streets of Cali by gunmen later identified as FARC members. After the shooting Alzate continued to receive increasingly frequent death threats from callers who identified themselves as FARC members, including calls referring to the attempted murder of Alzate and his wife, and stating that he would not survive another attack. The threats continued until Alzate brought his family to the United States. These events, including unrelenting death threats from the FARC, suspicious individuals asking

8

about Alzate's family's habits, and the attempted shooting of Alzate and his wife by the FARC, cumulatively amount to past persecution. See Ruiz, 479 F.3d at 766; Delgado, __ F.3d __, No. 05-16419, slip op. at 9. The IJ's finding to the contrary is not supported by substantial evidence.

Moreover, Alzate's persecution was on account of his political activities, a statutorily protected ground. Alzate was a lifelong member of, and active in, the Conservative Party. He worked with youth in Cali, attempting to prevent them from becoming involved in "subversive groups." AR at 89. The FARC expressly referred to this work in its threats. The FARC's overt reference to Alzate's political activities compel us to find that the FARC's persecution of Alzate was on account of those activities, see Delgado, __ F.3d __, No. 05-16419, slip op. at 3-4, 8-9 (record compelled finding that persecution was on account of political opinion where references to petitioner's political activities preceded attacks), and at oral argument the government candidly acknowledged that the events at issue occurred on account of Alzate's political opinion. Accordingly, we are compelled to find that Alzate established past persecution on account of his political opinion, and the IJ erred in finding otherwise.

The IJ's determination that Alzate could not qualify for asylum because the events in question occurred "almost five years ago" is also erroneous. It is undisputed that the FARC's persecution of Alzate and his family continued

9

unabated until they left Colombia for the United States. It is also undisputed that, upon reaching the United States, Alzate filed a timely application for relief. During the five years at issue, Alzate was actively pursuing his timely filed asylum application in the instant proceeding. Nonetheless, the IJ premised his denial of asylum, in part, on the fact that several years had passed between the time Alzate initiated the process of seeking asylum and the time a merits hearing was held.

The IJ identified no authority for the proposition that relief may be denied on account of the time that passed while an alien actively pursued relief, and denying relief on that basis was improper. An alien is not ineligible for asylum merely because of the time that passed between the filing of an asylum application and the date of a merits hearing, and we have routinely found petitioners eligible for relief on the basis of events that occurred many years earlier. See, e.g., id., No. 05-16419, slip op. at 3-4 (finding petitioner eligible for withholding of removal on the basis of events that occurred nine years prior to our decision); Niftaliev v. U.S. Att'y Gen., __ F.3d __, No. 06-12708, slip op. at 1-2 (11th Cir. May 25, 2007) (finding past persecution for purposes of asylum eligibility on basis of events that occurred more than a decade prior to our decision); Ruiz, 479 F.3d at 763-64 (finding petitioner eligible for withholding of removal on basis of events that occurred six years prior to our decision).

The IJ also improperly placed the burden on Alzate to show that he could

10

not avoid persecution by relocating within Colombia, citing a lack of evidence on the issue as a basis for denying Alzate's application. Because Alzate established past persecution on account of a protected ground, however, the burden is on the government to show both the feasibility and reasonableness of internal relocation. See 8 C.F.R. § 208.13(b)(1)(ii). Thus, a lack of evidence on the issue does not render Alzate ineligible for relief. Only if the government adduced sufficient affirmative evidence at the asylum hearing to show, by a preponderance of the evidence, both that Alzate could avoid future persecution by relocating within Colombia, and that, "under all circumstances, it would be reasonable to expect [him] to do so," is Alzate's presumption of a well-founded fear of future persecution rebutted. See id., § 208.13(b)(1)(i)(B).

### III. CONCLUSION

The record here compels a finding that Alzate suffered past persecution on account of his political opinion. Because the IJ erroneously found that Alzate did not suffer past persecution on account of a protected ground, the IJ did not reach the question of whether the government proved by a preponderance of the evidence that Alzate could avoid future persecution by relocating, and that such relocation would be reasonable under all of the circumstances. We therefore **GRANT** Alzate's petition, **VACATE** the decision of the IJ, and **REMAND** for a determination as to whether the government carried this burden.