[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 17, 2007
THOMAS K. KAHN
CLERK

_____

No. 07-10774
Non-Argument Calendar

_____

BIA       No. A97-391-064

LIRU CHEN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(August 17, 2007)**

Before TJOFLAT, DUBINA and CARNES, Circuit Judges.

PER CURIAM:

Petitioner is a native and citizen of China.  She arrived in the United States

at the Miami International Airport on August 9, 2003, without a passport, a document authorizing her admission into this country, or anything indicating her identity. She immediately applied for asylum, and, on August 11, 2003, a Department of Homeland Security ("DHS") Asylum Officer interviewed her.

Petitioner told the officer that she left China after being arrested and detained for arguing with a government workers' union over money. The argument occurred on June 1, 2003, after she and 18 others had been laid off at a government candy factory where they had been working. They had gone to the union's office to collect 350 yaun – the benefit they believed a government contract entitled them to receive – but the union officials on duty gave them 200 yaun instead. An argument ensued, and the officials called the police. Petitioner told the officials, and the police, that she would report the incident to the newspaper. When she declined to sign a document stating that she would not report the incident to the newspaper, the police gave her a beating, and then took her to the police station. Her parents promptly bribed the police or the union officials to get her out of the police station so she could see a doctor. After the police released her so she could see a doctor, she fled to a relative's residence. Her journey to the United States began there.

The Asylum Officer denied petitioner's asylum claim. The next day, August 12, the DHS issued a Notice to Appear, charging petitioner with removability as an

immigrant not in possession of documents validating her entry or identifying her as the person she purported to be. Eight days later, she appeared before an Immigration Judge ("IJ") for an initial hearing. When she told the IJ that she had contacted an attorney, the IJ continued the hearing. The hearing resumed on January 8, 2004, before another IJ. At that hearing, petitioner conceded removability, and filed a formal application for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and protection under the Convention Against Torture ("CAT"). The same IJ heard the application on July 25, 2005.

At the July 25 hearing, petitioner testified that she left China due to a June 1, 2003 conflict with the Chinese government over the 200 yaun benefit she and 18 other workers received after being laid off at the candy factory where they worked.[1] She was the spokesperson for the group, and went with the group to the union's office, which represented the Chinese government, to claim the 350 yaun per month benefit the government contract purportedly called for. Petitioner told the union officials on duty that if they refused to reach a reasonable settlement with her group, she would publicize the incident by speaking to local newspapers. According to petitioner, the officials were afraid of publicity – because they were

---

[1] Petitioner said she had been employed at the candy factor by the Chinese government from 1996 until 2003.

3

corrupt, retaining for themselves part of the money due the laid-off employees.

The officials called the police. When she refused to sign a document indicating that she would not go to the newspaper, the police beat her and took her to the Fuzhou Prison. She was detained there for three days – until she escaped. When her parents learned of her incarceration, they paid the police 3,000 yaun so they could visit her for five hours at the prison.[2] During the visit, she escaped through a window and ran to a relative's home. She hid there until her family and relatives paid a snakehead, i.e., smuggler, $55,000 to enable her to travel to the United States. She left China with her own passport, and traveled through Thailand and three other countries she could not name before arriving in Miami. She entered Miami without her passport because the snakehead told her to destroy her passport so she would have nothing to identify her when she arrived in the United States.[3]

On cross-examination, petitioner said that after the police took her to Fuzhou Prison, her parents paid the police 3,000 yaun so that could take her to a hospital.

_____

[2] Petitioner said that a "very good-hearted person" at the prison observed her suffering in the prison, and told her parents that she was in custody there and was not being deprived of food and water.

[3] Petitioner introduced into evidence a birth certificate that had been notarized and issued on September 8, 2003 – long after she left China – and mailed to her by her parents. Regarding the birth certificate, petitioner testified initially that everyone in China had to have a birth certificate. When confronted with the issuance date of September 8, 2003, she explained that citizens had ID cards and that they could present the card at the notary office and obtain a notarized birth certificate at any time.

Two policemen accompanied her to the hospital, and after she entered the building, they stood guard outside, in front of the building. She escaped though a second story window, climbed down a fire escape, and ran without stopping for 40 minutes until she reached the residence of some relatives. A medical booklet – purportedly prepared by the physician who treated petitioner at the hospital and presented to the IJ – contained no mention of her escaping from the hospital.[4] The booklet indicated that, at the time the physician saw her, she was bleeding from the nose and neck, her body was covered with bruises, her face was swollen and her teeth were broken, and she was suffering from headaches and vomiting. Notwithstanding this bodily condition, she testified that she was able to escape from the hospital and to the relatives home without stopping.

At the conclusion of the hearing, the IJ denied petitioner's claim for asylum, withholding of removal, and CAT protection, and ordered her removal. The IJ began his findings by stating that she had not established her identity. He focused on her birth certificate, indicating that she had not satisfactorily explained how it could have been notarized and issued after she left China. Petitioner's photograph was attached to the certificate, but there was nothing in the record explaining that the notary was aware of petitioner or her likeness so as to certify that the person in the photograph was the person to whom there was a birth certificate on file.

_____

[4] Petitioner did not indicate how she happened to obtain the booklet after leaving China.

Second, the IJ concluded that petitioner had not established a case for asylum.  She had shown no political opposition on her part to the Chinese government, except for the fact that, according to her, she had been denied the lay-off benefit she thought she and the others were due.  After noting that the Chinese government is a pervasive force in Chinese society, exerts great power and influence, and controls the media, the IJ found it unlikely that given the close relationship between the candy factory and the union officials and the government, the police would have been so concerned about what petitioner might tell the news media – which the government also controlled – that they would have arrested and beaten her and held her in prison.[5]  The IJ therefore concluded that all petitioner had shown was that she had been involved in a monetary dispute with her employer.  In her asylum application, she claimed that her threat to publicize the dispute, i.e., the officials' refusal to pay the 350 yaun she and the others demanded, constituted a statement of a political point of view.  The IJ found that it was not.

Assuming, however, that the threat amounted to the expression of a political opinion, the IJ found that the petitioner's testimony in support of that protected ground was not credible.  For example, there was a major discrepancy between her statements to the Asylum Officer on August 11, 2003, and what she put in her

---

[5] The inference to be drawn from petitioner's testimony is that had she not escaped from the hospital, she would have been detained in prison indefinitely.

asylum application and subsequently told the IJ at the July 25 hearing. She told the Asylum Officer that she had never been arrested. In her asylum application and at the July 25 hearing, however, she said that she had been arrested by the police and detained for three days – during which time the police beat her severely and deprived her of food and water. She attempted to explain this crucial discrepancy by saying that she was confused during her interview with the Asylum Officer. The problem with her explanation was she appeared fully able to understand the Officer's questions and to answer them coherently. The IJ found implausible her testimony that she climbed out of a second story window (at the hospital) and ran without stopping for 40 minutes notwithstanding her very debilitating physical condition, which would have made such a feat nearly impossible. Also implausible was her testimony that she was in police custody while at the hospital. The police were purportedly there to prevent her from escaping, yet they took no steps to prevent an escape. They simply stood idly outside the hospital.[6]

Petitioner timely appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). On February 2, 2007, the BIA affirmed. Petitioner then petitioned this court for review.

We dismiss her petition to the extent that it seeks review of the denial of

---

[6] These are the principal discrepancies between what petitioner told the Asylum Officer and what she stated later. The IJ accurately cited other discrepancies which undermined her credibility.

withholding of removal and CAT protection. Although her brief to the BIA

referred to such denial, the brief did not explain, or present any reason, why that

ruling should be set aside. We lack jurisdiction to review a claim not presented to

the BIA. See INA § 242(d)(1), 8 U.S.C. § 1252(d)(1). See also Camacho-Salinas

v. U.S. Att'y Gen., 460 F.3d 1343, 1347 n.1 (11th Cir. 2006); Rowe v. Schreiber,

139 F.3d 1381, 1382 n.1 (11th Cir. 1998) (stating that issues not clearly raised in

the briefs are considered abandoned). We turn, then, to what we are able to

review: the BIA's denial of petitioner's asylum claim.[7]

An alien who arrives in or is present in the United States may apply for

asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of DHS or the

Attorney General has discretion to grant asylum if the alien meets the INA's

definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A

"refugee" is

> any person who is outside any country of such person's nationality . . . , and
> who is unable or unwilling to return to, and is unable or unwilling to avail
> himself or herself of the protection of, that country because of <u>persecution or
> a well-founded fear of persecution on account of</u> race, religion, nationality,
> membership in a particular social group, or <u>political opinion</u> . . .

---

[7] In this case, because the BIA adopted the IJ's decision, we review the IJ's decision
Nreka v. U.S. Att'y Gen.,408 F.3d 1361, 1368 (11th Cir. 2005). We review the IJ's legal
determinations de novo, Ruiz v. U.S. Att'y. Gen., 440 F.3d 1247, 1254 (11th Cir. 2006), and the
IJ's factual findings under the substantial evidence test. We uphold those findings if supported
by "reasonable, substantial, and probative evidence on the record considered as a whole." Id. at
1254-55.

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (emphasis added). The asylum applicant carries the burden of proving statutory "refugee" status. 8 C.F.R. § 208.13(a); Ruiz v. U.S. Att'y Gen., 440 F.3d at 1257. To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause such future persecution. 8 C.F.R. § 208.13(a), (b); Ruiz, 440 F.3d at 1257.

Petitioner contends that her statement that she would tell the newspaper about the union officials' refusal to pay her and the members of her group 350 yaun constituted the expression of a political opinion. We disagree, for the reason the IJ gave: the statement concerned a dispute with her employer over the amount of the benefit they were to receive – according to a government contract -- after having been laid off work.

Assuming that petitioner's statement constituted an expression of political opinion, the IJ rejected her testimony – about making the statement – because he found the testimony not credible. We review the IJ's credibility finding under the substantial evidence test. "If an IJ wishes to make an adverse credibility finding, he must do so explicitly." Niftaliev v. U.S. Att'y Gen., 487 F.3d 834, 840 (11th Cir. 2007). "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by

9

'specific, cogent reasons,' or was not based on substantial evidence." Ruiz v. U.S. Att'y Gen., 440 F.3d at 1255. "Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." Id. at 1255. An adverse credibility finding alone is sufficient to support the denial of an asylum application; however, an adverse credibility finding does not alleviate the IJ's duty to consider other evidence produced by the applicant. Id.

The IJ's finding that petitioner lacked credibility was supported by evidence showing that with respect to the sole basis of her asylum claim, what she told the Asylum Officer was inconsistent with what she stated in her asylum application and at the July 25, 2005 hearing. She told the Asylum Officer that she had never been arrested; yet she went into considerable detail – in her application and at the hearing – describing an arrest and beating that took place on June 1, 2003. The record supports the IJ's findings regarding other, less material inconsistencies. For example, the medical booklet she presented contained no mention of her escaping from the hospital while being treated there. The evidence regarding the extent of her injuries was also inconsistent with her testimony that she ran without stopping for 40 minutes following her escape.

**PETITION DISMISSED, in part; DENIED, in part.**