[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 18, 2007
THOMAS K. KAHN
CLERK

No. 07-11377
Non-Argument Calendar
_____

BIA Nos. A95-227-564 & A95-227-565

NSOU AZONDEGA,
TAMARA BORISOVNA AZONDEGA,

                                        Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                        Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

**(September 18, 2007)**

Before WILSON, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

Nsou Azondega, the lead petitioner, and Tamara Borisovna Azondega, his

wife, petition this court for review of the order of the Board of Immigration

Appeals' ("BIA") decision affirming the Immigration Judge's ("IJ") denial of their

applications for asylum and withholding of removal under the Immigration and

Nationality Act ("INA").  Nsou Azondega is a citizen of Togo and Tamara

Borisovna Azondega is a citizen of Ukraine.[1]

## I. BACKGROUND

Azondega last departed his homeland of Togo in August of 1991, following

a brief two-week visit there.  He had been studying in Ukraine since 1986 and had

only returned home twice to visit—once in 1989 and once in 1991.  Upon

returning to Ukraine in 1991, Azondega continued his studies and met and married

his wife.  The couple moved to Germany in 1994 so he could continue his studies

and they remained there until October of 1999 when he came to the United States

under a student visa.  He ceased being a student in March of 2001.

Tamara Borisovna Azondega entered the United States in November of

2000 with a visitor's visa.  She had permission to stay until December 31, 2001

but remained beyond that date.

Azondega testified that he had personal run-ins with Togolese officials and

---

[1]  Because her claim is derivative of his, this opinion will use "Azondega" to refer to his
claims.

that these encounters help to provide the motivation for Togolese officials to persecute him. While he was studying in Ukraine in 1990 Azondega attended a meeting in Stockholm, Sweden also attended by the Togolese minister for telecommunications. At that meeting, Azondega suggested to the minister that Togo should consider using telecommunications equipment from Russia instead of relying exclusively on France. Azondega testified that this suggestion angered the minister. He also testified that he encountered that same minister in 1991 at a meeting with several other Togolese students. The students had an obligation to Togo upon their graduation in 1992 and were learning about their placements with the government.[2] Azondega testified that the geographic locations of some of the placements were in areas he considered to be unsafe and he expressed concern for his safety. He asserts in a written statement that the minister recognized Azondega as the person with whom he had an exchange in Stockholm in 1990 and that the minister became angry and told him to keep quiet or he might be prevented from returning to school.

While studying in Germany, Azondega attended a meeting between the

---

[2] The record is not clear about what specific obligation Azondega and other similarly-situated students had to Togo. As the IJ points out, the obligation presumably extends from the Togolese government financing their education abroad in exchange for service to the Togo upon their return.

leader of Germany's green party and the prime minister of Togo. Azondega testified that there were approximately twenty other Togolese students in attendance and that he spoke out at the meeting to contradict the prime minister's assertions that things were well in Togo. Although he made this statement to the prime minister, Azondega testified that he provided a false name during the course of the meeting so that he would not be identified.

Azondega also testified that he acted in opposition to the Togolese government. During his two-week visit to Togo in 1991 he joined CAR, a political organization in opposition to the government, and that upon his return to Ukraine he helped to spread CAR's ideas among fellow Togolese students. He also periodically corresponded with CAR's leader in Togo, but there are no claims that these letters were ever intercepted or shared with members of the Togolese government. Similarly, he testified that he was the CAR representative in Hamburg, where there were approximately 150 Togolese. The Hamburg CAR group held periodic meetings, but there was no evidence that members of the Togolese government ever learned of what took place during those meetings or that the meetings even took place.

Additionally, while in Germany in 1998, Azondega attended a demonstration of approximately fifty students protesting the Togolese

4

government.  Though he testified that the protest was covered by a Hamburg radio station, it was not the subject of television coverage and no photographs were taken.  The same group of students that attended the demonstration sent a letter to the German government protesting a visit of the Togolese prime minister to Germany, though none of the students' names were on the letter.

During Azondega's time away from Togo, he had to periodically renew his passport.  In 1994 and 1997 he was able to do so without difficulty.  The passport expired in August of 2000, though, and in September of 2001 he sent it to his brother in Togo to seek renewal.  This time, however, the government refused to renew it and instructed the brother to inform Azondega that he should go to the Togolese embassy in the country in which he was located.  Azondega testified that he believed this was a sign that he was wanted by the government.  He claimed that this "wanted" status was confirmed when the government sent two documents to his Togolese address in November of 2001—two months after seeking passport renewal.  The first was a summons to appear before the National Guard.  The second purports to be an arrest warrant.

In support of his assertion that the non-renewal of the passport is a sign that he will be persecuted upon return to Togo, Azondega presented the testimony of Dr. Bayor, a general surgeon from Togo.  Dr. Bayor testified that he was a student

5

abroad in 1969 and that when his passport renewal was denied, he viewed himself as a marked man. Nonetheless, he returned to Togo in 1972 and remained there until 1993 without incident, despite carrying on covert political activities.

Azondega also testified that his parents were interrogated regarding his whereabouts and because of their refusal or inability to provide the government with desired information, they were each jailed for three days. Relatedly, Azondega testified that his brother was beaten during a post-election demonstration that was broken up by the government. There was no indication, though, that he was singled out by the police for being Azondega's brother.

Azondega also testified that he was personally attacked because of his political beliefs. In 1992, Azondega was attacked on the street while in Ukraine. His attackers were not found and there was no evidence to suggest the motive of the attack.

Based upon all this evidence, the IJ denied asylum and withholding of removal under the INA. The BIA adopted the IJ's order.[3] Here, Azondega appeals the BIA's decision.

---

[3]Azondega also argued before the IJ and BIA that he was entitled to withholding of removal in accordance with the United Nations Convention Against Torture. We do not consider this claim here, though, because Azondega waived it by not addressing it in his brief. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 (11th Cir. 2005).

## II. DISCUSSION

Azondega contends that the IJ erred by not granting asylum. Particularly, he argues that the IJ erred by not finding that he has a well-founded fear of persecution and that the IJ's decision was not supported by substantial evidence. He also claims that the IJ erred by not granting withholding of removal.

We review only the BIA's decision except to the extent that the BIA expressly adopts the IJ's decision. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). To the extent that the decision is based on a legal determination, we review the decision de novo. Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1254 (11th Cir. 2006). Factual determinations are reviewed under the substantial evidence test, and this court "must affirm the BIA's [or the IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1283-84 (citation and internal quotation marks omitted). Additionally, "[u]nder the substantial evidence test, we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Ruiz, 440 F.3d at 1255 (citing Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. 1035 (2005)). Thus, "a finding of fact will be reversed only when the record compels a reversal; the mere fact that the record may support a

contrary conclusion is not enough to justify a reversal of the administrative findings." Id. (citation omitted).

*a. Asylum*

The IJ may grant asylum if an alien meets the INA's definition of a "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). The INA defines a refugee as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The asylum applicant bears the burden of proving refugee status. Al Najjar, 257 F.3d at 1284. To meet this burden, the applicant must establish, with specific and credible evidence, (1) past persecution on account of a statutorily listed factor, *or* (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. "[O]nly in a rare case does the record compel the conclusion that an applicant for asylum has suffered past persecution or has a well-founded fear of future persecution." Silva v. U.S. Att'y Gen., 448 F.3d 1229,

8

1239 (11th Cir. 2006). As this court has explained, "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation." Sepulveda, 401 F.3d at 1231 (internal quotation marks omitted). And "mere harassment does not amount to persecution." Id.

If the asylum applicant establishes past persecution, he is presumed to have a well-founded fear of future persecution, unless the government can rebut the presumption. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004). If he cannot show past persecution, then he must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable. Ruiz, 440 F.3d at 1257. The subjective component can be established "by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id.

Here, Azondega asserts that the IJ erred in determining that he did not have a "well-founded fear" of persecution and that substantial evidence did not exist to reach this conclusion. We disagree. The evidence does not compel the fact finder to conclude that a "well-founded fear" exists. Accordingly, we cannot reverse.

To support his claim, Azondega contends that his interactions with both the

9

minister of communications and the prime minister and his political activities provide the motive for the Togolese government to persecute him. He argues that the denial of renewal of his passport, the subsequent documents he received at his Togolese address, the attack in Ukraine, and the interrogations and beatings of his family members are all evidence that he will be persecuted upon his return to Togo.

The IJ rejected Azondega's claim that he had a "well-founded fear" of persecution. First, the IJ determined that much of the basis for Azondega's argument can be rejected by analyzing it chronologically. Azondega claims that the denial of renewal of his passport was the first sign that he was a "marked man." But his passport was renewed without incident in both 1994 and 1997. Assuming, therefore, that the denial did in fact indicate his "markedness," any actions before 1997 could not be the basis of this status because Togo renewed the passport. Thus, the interactions with the minister of communications and any political activities with CAR prior to 1997 cannot be the basis of any "well-founded fear." Additionally, the IJ found that the denial of the passport renewal was not a sign that he was a "marked man." Dr. Bayor testified that his passport was denied renewal in 1969. He returned home to Togo and lived without incident for over twenty years. Azondega failed to provide any evidence to

support the claim that denial of the passport renewal was a sign that the Togolese government would persecute him.

Second, the IJ doubted the authenticity and consistency of the evidence presented, assigning it little weight. Specifically, the IJ found that the summons to appear before the National Guard and the arrest warrant were unreliable because of their form. Both documents were printed on computer paper and had blank lines to be filled in by hand. Thus, the IJ determined that they could be manipulated by anyone with a "modicum of computer skills." Further, the IJ thought it would be nonsensical to send an arrest warrant through the mail. Moreover, the IJ questioned why the Togolese authorities would send a summons and arrest warrant to his Togolese address if government officials were looking for him and had recently told Azondega's brother that Azondega was to report to an embassy abroad. The IJ also had trouble believing that the government officials interrogated Azondega's parents as to his whereabouts when the officials knew that Azondega was abroad and beyond their control.

Third, Azondega failed to provide any evidence that the Togolese government knew of his political activities and associations, had any role in the 1992 attack in Ukraine, or that his brother's being beaten was in any way related to Azondega's activities.

11

Thus, Azondega does not meet his burden to show that the evidence compels a reversal of the BIA's denial of his petition for asylum.

### b. *Withholding Removal*

The burden an appellant must meet to prevail on a withholding of removal claim is more stringent than the burden to succeed on an asylum claim. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1288 n.4 (11th Cir. 2005). Because Azondega's claim for asylum fails, his claim for withholding of removal necessarily fails as well. Id.

## III. CONCLUSION

Accordingly, we **DENY** Azondega's petition.