[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 10, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-13924
Non-Argument Calendar

_____

BIA No. A95-896-923

ROBERTO MARIO PINEDA-BUITRAGO,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(April 10, 2008)**

Before DUBINA, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

Roberto Mario Pineda-Buitrago, a native and citizen of Colombia, petitions

this court for review of the Board of Immigration Appeals' (the "BIA") decision affirming and adopting the Immigration Judge's (the "IJ") denial of his claims for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). Pineda-Buitrago argues that substantial evidence does not support the IJ's adverse credibility finding or the alternative finding that he failed to establish past persecution or a well-founded fear of persecution on a protected ground. For the reasons discussed below, we affirm the BIA.

## BACKGROUND

Pineda-Buitrago filed an application for asylum, withholding of removal, and relief under CAT on July 20, 2002, approximately six months after arriving in the United States. He explained that he sought asylum because the Revolutionary Armed Forces of Colombia ("FARC") had declared him a military objective based on his political activities, consisting of his support of politicians in setting-up events and participation in "health brigades" in nearby towns. At these health brigades, Pineda-Buitrago donated clothing and canned food and encouraged families to vote, even though FARC had warned the families not to vote.

In an addendum to his asylum application, Pineda-Buitrago alleged that he received his first threat from FARC in September of 2001 when a FARC member, who identified himself as Chino, telephoned him and told him to stop going to an area called Malambo, which was FARC territory. Chino warned him that if he

2

continued to do so, he "would regret it." Pineda-Buitrago stated that he then received frequent and aggressive telephone calls, first at his job, and then at his home in October 2001. Pineda-Buitrago and his wife then moved into the building where his in-laws were living. At that point, Pineda-Buitrago stopped his political involvement out of fear of the FARC.

The addendum stated that a few months later on December 28, 2001, Pineda-Buitrago was driving home from work and noticed a car following him. He managed to get away by running a red light. That night, Chino called him and said that he had gotten lucky but would not be so lucky in the future, and that he had been declared a military objective because he did not heed previous warnings.

In his interview with the asylum officer, Pineda-Buitrago stated that he did not report the above incident to the police.[1] Later, at his immigration hearing, Pineda-Buitrago testified that he did report the incident to the police that same night, and he produced a copy of the police report. To explain the inconsistency, Pineda-Buitrago testified that he was nervous during the interview and told the asylum officer that he had not reported the incident to the police because he thought he would not be believed without documentation.

Three days after the vehicle chase, Pineda-Buitrago and his family moved to

---

[1] The record does not contain materials from the interview with the asylum officer. However, Pineda-Buitrago admitted in his hearing testimony that in the interview he stated that he did not report the incident to the police.

a relative's house in Cartagena. Chino later contacted him in Cartagena, and Pineda Buitrago decided to leave the country.

Attached to Pineda-Buitrago's asylum application was a January 2002 letter from the Governor of the Atlantic Department in Columbia. The letter stated that Pineda-Buitrago was an active member in the Liberal Party and had supported the governor in several campaigns, including his 2000 campaign for governor and due to Pineda-Buitrago's political activities, he was forced to leave the country for his own personal safety.

Pineda-Buitrago testified at his immigration hearing that he received written threats from FARC as well, although he did not mention this either in his asylum application or in his interview with the asylum officer. At his hearing, he also produced copies of these typed letters, dated January 2002. He testified that he received the letters in January 2002 while living with his wife's uncle in Cartagena. He stated that he had crumpled the letters up and thrown them away, but, unbeknownst to him, his wife's relatives had kept these letters safe and then sent them to him in America after he applied for asylum but before his hearing. The letters he produced, however, were clean copies that did not appear ever to have been crumpled. He testified that he had not produced them earlier because he did not know that his ex-wife's relatives had kept them and so did not think they were available to him. He explained that his ex-wife's uncle had taken the letters out of

4

the trash, saved them "in case they were going to be needed," but never said a word to him about it until 2003 when he was going through the asylum application process in the U.S. He also testified that he had not mentioned these letters to the asylum officer because he did not think he would be believed without having the letters, just as he explained his statements regarding the vehicle chase.

The parties submitted several documents into the record. Pineda-Buitrago submitted a 2002 INS report on health brigades, which described them as "mobile medical teams that travel in rural and urban areas to provide primary medical care and diagnostic evaluations," and that constitute a central part of humanitarian work carried out in Colombia. The government submitted the State Department Country Report on Colombia.

Pineda-Buitrago also introduced into evidence his marriage license and testified that, after arriving in the United States, he had married for the second time. His new wife was previously granted asylum in this country. His wife did not testify and no information regarding the basis for her asylum was introduced.

The IJ issued an oral decision denying Pineda-Buitrago's request for asylum and withholding of removal. The IJ specifically found that Pineda-Buitrago was not credible. The IJ explained that she based this determination on the inconsistencies between the interview with the asylum officer and Pineda-Buitrago's testimony at the immigration hearing. The IJ felt it was not believable

for Pineda-Buitrago to have affirmatively stated to the asylum officer that he had not reported the vehicle incident to the police just because he did not have a copy of the written police report. The IJ found it even more unbelievable in light of his ability to produce the report at the hearing.

The IJ was also suspicious of the alleged written threats from FARC since Pineda-Buitrago had not mentioned receiving such threats to the asylum officer. Furthermore, he testified that he had crumpled them up and thrown them away but was able to produce them at his hearing in pristine condition. The IJ also based the adverse credibility finding on her determination that "FARC has no interest in this respondent" because, at most, Pineda-Buitrago was involved in social work, not politics or government work. Because of Pineda-Buitrago's low level of political involvement, the IJ found it incredible that FARC would be interested in him enough to warrant sending threatening letters.

The IJ also questioned the authenticity of the police report and the FARC letters because Pineda-Buitrago had not told the asylum officer of their existence, and had then been able to produce them for his hearing. Additionally, the documents were not originals and were not authenticated. The IJ noted that FARC letters "are easily fabricated through the internet."

The IJ also found that Pineda-Buitrago's credibility was diminished by the "almost generic claim in some of these applications . . . that the day after the

6

incident the individual receiv[es] a phone call from the alleged offender telling them that they were very lucky on that particular occasion and that the next time they would not be so lucky." The IJ found it not credible that persecutors would congratulate their attempted targets for getting away.

The IJ dismissed Pineda-Buitrago's current wife's asylum status as irrelevant because her claim was unrelated and the IJ did not have the opportunity to review the wife's asylum claim.

After noting these problems with Pineda-Buitrago's evidence and testimony, the IJ determined that Pineda-Buitrago had not met his burden of proof for political asylum or withholding of removal. Finally, the IJ found that Pineda-Buitrago had never been tortured in Colombia and that FARC was not a governmental entity, and so Pineda-Buitrago had not made out a claim for relief under CAT.

Pineda-Buitrago appealed this ruling to the BIA which affirmed and adopted the IJ's decision. The BIA stated that the IJ's adverse credibility finding was not clearly erroneous. The BIA added that the alleged threats did not rise to the level of persecution and were not shown to have been carried out on account of a protected ground. The BIA concluded that Pineda-Buitrago had not established past persecution nor demonstrated that it is more likely than not that he would be persecuted in the future in Colombia. Accordingly, the BIA dismissed the appeal.

## STANDARD OF REVIEW

The IJ's factual determinations are reviewed under a "substantial evidence" standard and "the IJ's decision can be reversed only if the evidence compels a reasonable fact-finder to find otherwise." Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1230-31 (11th Cir. 2006) (quotations omitted). "Under this highly deferential test, we affirm the IJ's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation and alteration omitted). Credibility determinations are factual determinations. Chen, 463 F.3d at 1230-31.

We review legal determinations de novo. Hernandez v. U.S. Att'y Gen., 513 F.3d 1336, 1339 (11th Cir. 2008).

## DISCUSSION

To qualify for asylum, the applicant must establish his status as a "refugee." See 8 U.S.C. § 1158(b)(1)). A "refugee" is:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the burden of proving

statutory refugee status.  Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001).

To do so, the alien must establish (1) past persecution on account of a statutorily

listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause

such future persecution.  Id. at 1287; 8 C.F.R. § 208.13(a), (b).

"The asylum applicant must establish eligibility for asylum by offering

credible, direct, and specific evidence in the record."  Forgue v. U.S. Att'y Gen.,

401 F.3d 1282, 1287 (11th Cir. 2005) (quotation omitted).  The credible testimony

of an applicant alone may be sufficient to establish eligibility for asylum.

D-Muhumed v. U.S. Att'y. Gen., 388 F.3d 814, 819 (11th Cir. 2004).

"Conversely, an adverse credibility determination alone may be sufficient to

support the denial of an asylum application."  Forgue, 401 F.3d at 1287.   The IJ

must provide specific, cogent reasons supporting his adverse credibility

determination.  Id.  "Once an adverse credibility finding is made, the burden is on

the applicant alien to show that the IJ's credibility decision was not supported by

specific, cogent reasons or was not based on substantial evidence."  Id. (quotation

omitted).  "This court may not substitute its judgment for that of the IJ with respect

to credibility findings."  Id. at 1286.

In this case, the IJ gave well-articulated, specific reasons for her adverse

credibility finding.  This finding is supported by substantial evidence in the record.

"Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1255 (11th Cir. 2006). In Chen, this Court upheld an adverse credibility determination where the IJ cited "a number of inconsistencies and discrepancies between Chen's asylum application, his credible fear interview, and his testimony at the removal hearing." 463 F.3d at 1231-32.

Here, Pineda-Buitrago's testimony was inconsistent with his asylum application and with his interview with the asylum officer. Pineda-Buitrago told the officer that he did not report the vehicle chase to the police, and then at his immigration hearing he stated that he had reported the incident and produced the police report. The IJ cogently found that Pineda-Buitrago's explanation for this omission at the asylum interview—that he did not have a copy of the report in hand at the time—was not credible, because he should have informed the officer that he had in fact filed a report, even though he did not have a copy of it at the time. Additionally, he never mentioned in his application or his interview that he ever received written threats from FARC, yet he testified that he received two such letters. Furthermore, he testified that he had crumpled up and thrown away the letters when he received them in January 2002 in Colombia, and then not only produced the letters at his hearing four years later, but produced them in pristine condition. The IJ was entitled to find incredible Pineda-Buitrago's testimony that

his ex-wife's family took the letters out of the garbage and saved them, and did so without telling him. This court is not permitted to substitute its judgment with respect to these factual credibility findings which are supported by the record.[2] Forgue, 401 F.3d at 1286. Additionally, although Pineda-Buitrago offered explanations for these inconsistencies, we cannot say that his explanations compel this court to reverse the IJ's credibility determination. See Chen, 463 F.3d at 1233.w

Even with an adverse credibility determination, the IJ still has a duty to consider other evidence produced by an asylum applicant. Forgue, 401 F.3d at 1287. In this case, however, the record as a whole supports the IJ's determination that Pineda-Buitrago failed to establish past persecution on account of a protected ground. Pineda-Buitrago's testimony was found incredible as were the police report and the letters from FARC. That leaves only the governor's letter confirming Pineda-Buitrago's participation in the health brigades, the country report, and his wife's status as a refugee who has been granted asylum. This evidence does not support Pineda-Buitrago's claim for asylum. He has offered no credible evidence demonstrating that he experienced persecution in Colombia nor

---

[2] The court notes that the IJ referred to the phone call from FARC after the vehicle chase as "generic" and "boilerplate," and concluded that this made the call incredible. The specific basis for this determination is unclear, but the adverse credibility finding is otherwise supported by the record for the reasons stated above.

that he has a well-founded fear of future persecution. Pineda-Buitrago has offered no evidence that FARC is aware of his marriage or would have an interest in persecuting him because of its opinion of his wife. Thus, substantial evidence supports the IJ's denial of Pineda-Buitrago's asylum application. Having failed to satisfy the standard for asylum eligibility, he necessarily has failed to meet the more stringent standard for withholding of removal. Najjar, 257 F.3d at 1292-93. Finally, nothing in the record indicates that Pineda-Buitrago was tortured or would be tortured in the future, and so he has not established eligibility for relief under CAT.

## CONCLUSION

Because substantial evidence supports the IJ's decision, Pineda-Buitrago's petition is **DENIED**.