[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-12592
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 20, 2011
JOHN LEY
CLERK

Agency No. A079-474-330

YELENA VLADIMIROVNA ILINA,
YURIY ALEKSANDROVICH ILIN,

                                        Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                        Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(April 20, 2011)

Before EDMONDSON, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Yelena Vladimirovna Ilina, a native and citizen of Russia, petitions for review of the denial of her application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231(b)(3).[1] She argues that the Board of Immigration Appeals ("BIA") erred in determining that she had not testified credibly in support of her claims for relief.[2] For the reasons set forth below, we deny the petition for review.

## I.

Ilina entered the United States in 2000 on a nonimmigrant B2 visa. In 2004, she was served with a Notice to Appear that charged her with overstaying her visa, in violation of INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). She admitted the allegations and conceded removability.

Ilina applied for asylum on the basis of persecution she allegedly had experienced on account of her Jewish ethnicity and religion. Her application and first supporting statement described a general scapegoating of Jewish Russians for

---

[1] Ilina's brief does not discuss the denial of her request for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16. Accordingly, this issue is abandoned. *See Sepulveda v. U.S. Attorney Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

[2] Ilina also seeks review of the Board of Immigration Appeals's ("BIA") alternative ruling that her testimony, if credible, did not prove that she had suffered past persecution or that she held a well-founded fear of future persecution. Because we hold that the adverse credibility determination was supported by substantial evidence, we do not reach the alternative ruling.

the dire economic situation in Russia, and it indicated that she and her daughter had received "terrible treatment." She stated that her father was killed in 1972 with no motivation and that she had dropped out of college in 1982 due to daily mocking. She indicated that her daughter, Svetlana, was born with a heart condition, and the failure of the family's small business in the 1990s left them unable to pay for Svetlana's treatment. They decided in 1998 to come to the United States because the climate and medical care would be better for Svetlana's health.

In a second statement submitted through counsel four years later, as well as her testimony at the asylum hearing, Ilina described three main incidents of mistreatment. First, in discussing the economic destabilization and food rationing that took place after the fall of the Soviet Union, she recounted an incident in which, after waiting in line for two hours at the grocery store, she received the last available chicken. A neighbor who was in line behind her became angry, grabbed the chicken, and beat Ilina with it while yelling ethnic slurs.

Second, Ilina described a 1998 attack on the hotel at which she worked. A group of armed skinheads wearing swastikas entered the hotel lobby, and when Ilina asked them to leave, one of the men pushed her against a wall, held a knife against her, and said, "Shut up, Jewish bitch, or I will carve your stomach!" One

3

of the men stayed in the lobby with Ilina and her coworker while the other men went upstairs and attacked the foreign guests of the hotel.  After the attack, the men made Ilina and her coworker go upstairs to clean the blood from the hallway.  As they worked, Ilina briefly lost consciousness and cut her eye as she fell.  When the men left, they threatened to kill her if she told anyone what had happened.

Third, Ilina stated that she was volunteering at a Jewish community center one night in March 2000 when armed police officers stormed inside and demanded that she and the three other workers provide photo identification.  The police smashed the boxes of food that they were preparing for elderly recipients, placed Ilina and the other workers under arrest, and detained them in a single, crowded cell.  During interrogation of Ilina, an officer blew cigarette smoke in her face and said, "Well, you Jews have got to me."  When she began to choke on the smoke and tried to stand up, he hit her in the face and pushed her into her seat, saying, "Sit down, Jewish bitch.  You stand up when I say."  The interrogation lasted about an hour.  When she was released the next morning, the officers said that she would be arrested and sentenced for conspiracy against the government if she ever returned to the community center.  She was made to sign a document stating that she would not return to the community center.  She stated that she was sick and

bedridden for two weeks after the arrest, and that this incident prompted her and her husband to decide that they had to leave Russia.

Ilina also indicated that her mother's apartment has been repeatedly vandalized, and that police did not investigate the hit-and-run accident that killed her grandmother. She further stated that her sister was attacked in 2008 because she is Jewish.

At the asylum hearing, Ilina testified that she and her family came to the United States because their lives were in danger due to persecution. She indicated for the first time that a friend who was with her father when he was attacked had told her mother that the attackers referred to her father's "filthy Jewish family." She stated that she had received her visa to travel to the United States on the day of the raid on the community center, and she had thought that the visa was the reason for her arrest.

She indicated that her sister had been attacked by neo-Nazi hooligans who told her, "Jews get out of the country." She had not asked her sister to submit a statement to that effect. She submitted a copy of the police report on the incident, which said that her sister had declined criminal investigation of the incident and had told the police that it had been motivated by "personal cause." Ilina stated that her sister had declined investigation because she was scared of the attackers and

5

that no one at the police department would have written down that the incident was related to their Jewish heritage.

During its examination of Ilina, the government pointed out that she had not mentioned the grocery-store incident, the attack on the hotel, or the arrest at the community center in her asylum application or her first statement, and that those documents indicated that she came to the United States only to seek treatment for Svetlana. She acknowledged the discrepancies and omissions, stating that she had been scared and had written "what [she] thought would definitely not hurt her." She testified that Svetlana's health was her most important reason for coming to the United States, but her second reason was to save her own life.

The Immigration Judge ("IJ") denied all of Ilina's requests for relief and ordered her removed to Russia, finding that she had failed to present credible and sufficient evidence of past persecution or a well-founded fear of future persecution. In particular, the IJ found that Ilina's testimony was not credible. She had not mentioned the grocery-store incident, the attack on the hotel, or the arrest in her first written statement. Those omissions were significant, especially as they were the incidents on which Ilina relied to establish her claim of past persecution. Their omission from the original statement cast serious doubt on her credibility, to the point of leading the IJ to question whether the incidents had

6

occurred at all, and went to the heart of Ilina's claims, especially since the incidents presumably were fresher in her mind when she wrote the first statement than when she wrote the supplemental second statement. Ilina had testified that the incident at the community center had resulted in her family's decision to leave for the United States, so she should have at least mentioned it in her first statement, even if she did not provide details.

The IJ also found that Ilina had given inconsistent statements regarding her reason for coming to the United States, as her first statement indicated that she was motivated by a desire to seek medical treatment for Svetlana but her second statement and testimony indicated that she had left due to persecution. She had tried to explain the discrepancy in court by stating that her first reason for leaving was Svetlana's condition and the second reason was to save her own life, but her initial written statement had made no mention of that second reason or of any of the three main incidents supporting her persecution claim, particularly the arrest. Furthermore, Ilina's testimony about her visa to visit the United States indicated that she had already planned her departure before the arrest occurred and, therefore, her original identification of Svetlana's health as the motivation for her departure had been correct.

The IJ also noted that there was no proof that the woman at the grocery store had hit her with the chicken because of Ilina's religion or nationality. As to the hotel incident, Ilina's own testimony indicated that the foreign guests, not Ilina, were the targets of the attack. Ilina was only forced to clean the mess and threatened not to mention the incident to anyone. Her injury was a result of her fall, not of a beating. As to the community-center incident, an arrest and one-day detention were not sufficient to rise to the level of persecution. Therefore, even if the three incidents did occur, they did not constitute persecution. Finally, Ilina had failed to present evidence that her father's or grandmother's deaths were connected to their Jewish religion or nationality, the police report indicated that her sister had asked the police not to investigate the incident and had told them that it had "personal cause," and Ilina had not obtained statements from her sister or anyone else to establish that these incidents were related to religion or ethnicity. As Ilina had failed to establish past persecution or a well-founded fear of future persecution, the IJ found that she had not established grounds for asylum or, consequently, for withholding of removal.

Ilina appealed to the Board of Immigration Appeals ("BIA"), which dismissed her appeal. It concluded that the adverse credibility determination was not clearly erroneous. Ilina's failure to mention the incident with the chicken, the

incident at the hotel, or the arrest at the community center in her initial asylum application constituted material omissions. In particular, the failure to mention the arrest was a material omission because she testified that this event caused her finally to decide to flee Russia. Furthermore, the initial asylum application stated that Ilina and her husband decided to leave Russia "just to save the life of [their] daughter" after economic conditions caused their small business to fail. In light of the multiple omissions from the initial application and her claim of two totally different events precipitating her flight from Russia, the BIA would not disturb the IJ's adverse credibility determination. Without credible testimony, Ilina had not proved her eligibility for asylum.

The BIA also concluded in the alternative that, even if credible, Ilina's testimony had not demonstrated past persecution on account of a protected ground. The BIA stated that it was "sympathetic" to Ilina's account of being humiliated since childhood and suffering the loss of her father, but her testimony did not sufficiently establish that her father was killed on account of a protected ground. She was only threatened while working at the hotel because she witnessed a violent crime, not because she was being specifically targeted for harm. Her account of mistreatment and overnight detention by the police did not rise to the level of persecution. Furthermore, she had not demonstrated that

9

anyone from Russia had threatened her since she left or was interested in her whereabouts. Therefore, she had not shown that she was eligible for asylum or withholding of removal.

## II.

Where, as here, the BIA writes a separate opinion that does not rely upon the IJ's reasoning, we review only the BIA's decision. *See Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). "We will not reverse unless the record compels a contrary conclusion." *De Santamaria v. U.S. Attorney Gen.*, 525 F.3d 999, 1006 (11th Cir. 2008).

Factual determinations, including credibility determinations, are reviewed under the substantial evidence test, which requires us to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (*en banc*); *Chen v. U.S. Attorney Gen.*, 463 F.3d 1228, 1230-31 (11th Cir. 2006) (noting that the substantial-evidence test applies to credibility determinations). "We must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Adefemi*, 386 F.3d at 1027 (quoting *Al Najjar*, 257 F.3d at 1283-84) (quotation marks omitted).

10

Credible, uncorroborated testimony can be sufficient to satisfy the applicant's burden of proof of eligibility for asylum, whereas an adverse credibility determination alone can be sufficient to support a denial of asylum. *Ruiz v. U.S. Attorney Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006) (quoting *Forgue v. U.S. Attorney Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005)). Once the factfinder has made an adverse credibility determination, the applicant bears the burden of showing that the finding was not supported by specific, cogent reasons or was not based on substantial evidence. *Id.* (quoting *Forgue*, 401 F.3d at 1287). If the applicant produces evidence in addition to her otherwise incredible testimony, the factfinder has a duty to review that evidence and may not rely solely on the adverse credibility determination in deciding whether to grant asylum. *Id.* (quoting *Forgue*, 401 F.3d at 1287). The weaker the applicant's testimony, the greater the need for corroborating evidence. *Yang v. U.S. Attorney Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005).

We may not substitute our judgment for that of the factfinder when reviewing credibility findings. *Ruiz*, 440 F.3d at 1255. "Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." *Id.* We have held that an adverse credibility determination was supported by substantial evidence where the

11

applicant testified implausibly as to attacks on his home, there were numerous inconsistencies among the asylum application, testimony, and documentary evidence, and he failed to mention "a significant part of his claim" in his asylum application. *D-Muhumed v. U.S. Attorney Gen.*, 388 F.3d 814, 819 (11th Cir. 2004).

Here, the BIA stated that Ilina had made multiple material omissions in her asylum application when she failed to mention any of the three core incidents on which her claim was based. The BIA particularly noted her failure to mention the community-center arrest in her application, even though that event was the purported reason for her flight from Russia. The BIA also found that this stated reason directly contradicted her original statement that she left Russia "just to save the life of [her] daughter" when the failure of the family's business left them unable to obtain treatment for Svetlana's heart condition. Thus, the BIA set forth specific, cogent reasons for upholding the adverse credibility determination. *See Ruiz*, 440 F.3d at 1255.

In addition, the BIA's reasoning is supported by substantial evidence in the record as a whole. Ilina's application referred to frequent mockery and insults by non-Jewish Russians as a result of the scapegoating of Jewish Russians for the dire economic situation. Her initial written statement described the mockery she

12

experienced in school, and both the initial statement and the application said that her father had been killed for no reason. Her initial statement went into some detail about the economic hardships she had experienced throughout her life, but did not mention the grocery-store incident, the attack on the hotel, or the arrest at the community center. Ilina stated that they had tried twice to start a small business in order to pay for Svetlana's treatment, but she never suggested that anyone had denied treatment to Svetlana. She stated specifically that she and her husband decided in 1998, after the failure of their second business, that they would come to the United States "just to save the life of [their] daughter."

Her second statement, submitted through counsel four years later, added the three core incidents discussed by the IJ and BIA, and it asserted for the first time that, after the health-care system went into crisis in the 1990s, doctors advised her to seek treatment for Svetlana in Israel. The second statement further indicated that the family began planning its departure for the United States in 2000, after Ilina's arrest and detention. In her testimony, she indicated for the first time that her father's attackers had referred to his "filthy Jewish family." She testified that she and her husband decided after her arrest that they could not stay in Russia any longer, but she then said that she had obtained her travel visa on the day of her arrest. She acknowledged the omission of the three core incidents and the

13

different reasons she had given for the move to the United States, but said only that she had been scared and had written "what [she] thought would definitely not hurt" her. She did not indicate that her description of events was merely limited by her ability to express herself in English, or that she had not understood the application. Viewed in context of the record as a whole, substantial evidence supports the BIA's conclusion that the material omissions from the first application and Ilina's shifting explanations for the decision to come to the United States undermined her credibility. *See Ruiz*, 440 F.3d at 1255; *D-Muhumed*, 388 F.3d at 819.

Finally, Ilina did not submit supporting documentation to corroborate her specific claims, and the police report regarding the attack on her sister directly contradicted Ilina's assertion that the attack was based on her sister's Jewish ethnicity. The other documents in the record, including the Country Reports, simply indicate that anti-Semitism remains a problem in Russia but the government has been working to combat it.

As the adverse credibility determination was supported by substantial evidence, so, too, was the denial of asylum and withholding of removal. *See Ruiz*, 440 F.3d at 1255.

For the foregoing reasons, we deny the petition for review.

14

**PETITION DENIED.**